EOWEN S. ROSENTRATER, ISB No. 8581
LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington, Suite 402
Spokane, WA 99201
Telephone: (509) 868-5389
Fax:  (509) 271-3432

## UNITED STATES DISTRICT COURT
### IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PATRICIA MAY,<br><br>                                     Plaintiff,<br><br>    vs.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC., a Connecticut Corporation, HARTFORD-COMPREHENSIVE EMPLOYEE BENEFIT SERVICE COMPANY,  a Connecticut Corporation, THE HARTFORD,  a Connecticut Corporation, and HARTFORD LIFE AND ACCIDENT INSURANCE CO.,<br><br>                                     Defendants. | Case No.<br><br>PLAINTIFF'S COMPLAINT FOR REINSTATEMENT OF LONG TERM DISABILITY BENEFITS UNDER ERISA |

Plaintiff, Patricia May, by and through her attorney of record, Eowen S. Rosentrater, appears and

states by way of Complaint, the following:

### I. PARTIES, JURISDICTION AND VENUE

1.1 Plaintiff, Patricia May (hereinafter "Ms. May"), is an individual with an address of 1786 Lovell

Valley Rd., Plummer, ID 83851.

1.2  Defendant refers to itself throughout correspondence with Ms. May as well as on its website as

COMPLAINT
P a g e  | 1

The Hartford Financial Services Group, Inc., The Hartford, and Hartford Life and Accident Insurance Company (hereinafter "The Hartford"). None of these businesses appear to be licensed to conduct business in Idaho. Hartford-Comprehensive Employee Benefit Service Company appears to be a long term disability insurer, licensed to do business in Idaho, with an address of One Hartford Plaza, Hartford, CT 06155. All defendants are referred to collectively throughout as "The Hartford."

1.3 The Hartford holds itself out to be the "Plan Administrator" for benefits offered under ERISA.

1.4 This action is brought under, and jurisdiction of this matter is vested in this Court through the *Employee Retirement Income Security Act* (ERISA), and specifically 29 U.S.C. 1132(e), 502(e)(1), wherein the "state courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B)," in a civil action brought by a participant or beneficiary. All precedents necessary to suit have been met.

1.5 Venue is proper in this Court because The Hartford regularly conducts business in this state. All acts and occurrences forming a basis for this cause of action occurred in the State of Idaho.

## II. FACTS

2.1 Ms. May realleges and reincorporates all preceding averments as if fully set forth herein.

2.2 This action stems from a policy of long term disability insurance administered by The Hartford under which Ms. May was an insured.

2.3 Ms. May was born on April 22, 1956 and raised in Darby, Montana. She received her GED and was certified as a dental assistant through a home-study course at LaSalle University.

2.4 Ms. May was employed full-time in 1982 as a meter reader and collector for Puget Sound

COMPLAINT
P a g e | **2**

Energy, Inc. (formerly Washington Natural Gas Company) and was insured under a policy of Long-Term Disability insurance with Defendants.

2.5 For ten years, from 1982 through 1992, Ms. May was employed full-time by Puget Sound Energy, Inc. as a meter reader. While working as a meter reader for Puget Sound Energy Inc., Ms. May was an enthusiastic, energetic, and model employee. Her job was very physical, and she was on the move all day. She received the award of "employee of the month," as well as being portrayed on advertising posters around Seattle, with the president of the company.

2.6 Ms. May became disabled during her employment with Puget Sound Energy, Inc., and began to receive Long-Term Disability benefits (hereinafter "LTD") on June 10, 1992 while covered under the plan, which provides for payment in the event of disability.

2.7 Ms. May was originally placed on disability following a diagnosis of salmonella and complications with Chronic Fatigue Syndrome (hereinafter "CFS"), Irritable Bowel Syndrome (hereinafter "IBS"), and depression.  Within two years of being on disability, Ms. May was diagnosed with fibromyalgia.

2.8 Ms. May is dealing with on-going debilitating pain, chronic fatigue, anxiety, tenderness, stiffness, weakness, shakiness, reoccurring irritable bowel symptoms, irritability, and insomnia, all of which limit her daily activities.

2.9 Throughout her period of disability, while dealing with chronic illness, she has also tested positive for the Epstein Barr virus, chicken pox, and pneumonia.

2.10 Due to these significant medical ailments, Ms. May became and remains, fully disabled.

2.11 Ms. May was on LTD for nearly 20 years, from June 10, 1992 through August 18, 2011.

2.12 The Hartford paid 60% of her wages under the LTD benefits. Ms. May also receives Social

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)      (509) 271-3432 (F)

Security disability to supplement her income.

2.13 Ms. May was denied LTD benefits on August 18, 2011.

2.14 Ms. May appealed her denial of benefits and received a final denial letter from The Hartford's Benefit Management Services department on August 18, 2011.

2.15 Said denial of LTD benefits was an unfair claims practice, wrongful, illegal and unreasonable.

2.16 All administrative appeals have been exhausted. Ms. May has satisfied all conditions precedent to suit.

2.17 Significant medical evidence was presented to Defendants outlining the nature and extent of Ms. May's disability. Notwithstanding this medical evidence, Defendants continue to wrongfully deny Ms. May's LTD benefits.

2.18 Ms. May is currently a 56 year-old woman who has suffered from a number of physical, medical, and psychological problems over the past two decades. The current chronic and reoccurring medical aliments include CFS, Fibromyalgia, depression, and IBS. According to her testimony and medical providers' reports, her constant pain has "waxed and waned" over the years in terms of duration and location. All of her medical ailments seem to affect and exacerbate one another.

2.19 Ms. May is severely limited in her daily activities as a direct result of her medical problems. She can usually perform basic functions like getting dressed, using the restroom, feeding herself and driving a short distance. However, she needs assistance on a regular basis with cooking, cleaning, yard work, driving long distances, going to a store, etc. She uses assistance bars to get in and out of the bath tub and to climb the stairs. Ms. May sleeps 12-14 hours a night and takes naps during the day. She is becomes chronically exhausted after exerting minimal amount of physical energy on a reoccurring basis. Despite being prescribed a litany of medication and attempting numerous alternative therapies, "none of

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)      (509) 271-3432 (F)

1  the approache[s] have given her long lasting relief." *See* Ergo Physical Work Performance Evaluation,

2  April 6, 2011, p.3, attached hereto as Exhibit 1.

3      2.20 As part of her benefits package with Puget Sound Energy, Inc., Ms. May was insured by The

4  Hartford under a Long-Term Disability policy. At issue in this matter is Ms. May's eligibility for

5  continued coverage under this policy. For the past two decades Ms. May has been receiving disability

6

7  benefits under this policy. Under the policy, "Total Disability" is defined as:

8                 (1) during the Elimination Period; and
               (2) for the next 60 months,

9  You are prevented by Disability from doing all the material and substantial duties of your own

10  occupation. After that, and for as long as you remain Totally Disabled, you are prevented by
Disability from doing any occupation or work for which you are or could become qualified by:

11                 (1) training;

12                 (2) education; or
               (3) experience.

13  None of the ailments that Ms. May suffered from were excluded under the policy. *See* Life/Disability

14  Program manual, p. 9-10, attached hereto as Exhibit 2.

15      2.21 **Early history/Diagnosis**

16

17  2.21.1  In 1990, while still employed at Puget Sound Energy, Inc., Ms. May tested positive for

18  Salmonella, had bloody diarrhea, and was treated. *See* Letter from Dr. Thomas F. O'Meara, January 19,

19  1993, attached hereto as Exhibit 3. She started seeing a gastroenterologist by the name of Dr. Thomas F.

20  O'Meara for her continuing bowel problems. After her episode with Salmonella, Ms. May never

21  recovered. She developed "explosive diarrhea" and was diagnosed with "advanced Irritable Bowel

22  Syndrome," as well as suffering from "chronic right lower quadrant pain". *See* Medical History

23  Timeline, attached hereto as Exhibit 4. Dr. O'Meara described Ms. May's constant and often bloody

24  bowel problems as a "very complex case of idiopathic diarrhea." Dr. Thomas O'Meara report, October

25  28, 1993, attached hereto as Exhibit 5.

26

COMPLAINT
P a g e | **5**

2.21.2  Ms. May began to develop a series of other symptoms and was referred to a number of other specialists and participated in extensive testing in an effort to diagnose her issues. In December of 1990, Dr. O'Meara referred her to Dr. Andriacchi, who performed a laparoscopy and determined Ms. May did not have appendicitis. *See* Dr. Andriacchi Laparoscopy Report, December 3, 1990, attached hereto as Exhibit 6; *see also* Telephone conversation between Dr. O'Meara and Dr. Andriacchi, December 4, 1993, attached hereto as Exhibit 7. Ms. May also saw a Dr. Norton who performed an appendectomy. *See* Dr. Norton Operative Report, December 26, 1990, attached hereto as Exhibit 8.

2.21.3  Post-appendectomy, Ms. May's symptoms persisted. She began seeing Dr. Thomas Cooke as her primary care physician in 1991. Dr. Cooke conferred and worked in conjunction with Dr. O'Meara to treat Ms. May. *See* Dr. Cooke Office notes, July 14, 1992, attached hereto as Exhibit 9. Dr. Cooke performed a litany of laboratory tests, and finally diagnosed Ms. May with CFS in November of 1991. *See* Dr. Daryl Austin medical report, April 25, 1998, attached hereto as Exhibit 10; *see also* The Hartford Interoffice Memo, July 21, 1992, attached hereto as Exhibit 11. In an Attending Physician's Statement of Disability, Dr. Cooke reported Ms. May's subjective symptoms were fatigue, objective symptoms were abnormal lab results, and fever. *See* Attending Physician's Statement of Disability, May 13, 1992, attached hereto as Exhibit 12. Among other things, Ms. May tested high for the Epstein-Barr Virus, one of the indicators of CFS. *See* Dr. Cooke office notes, July 23, 1992, attached hereto as Exhibit 13. Jesse Fann also confirmed the diagnosis of CFS and noted a display of many objective physical symptoms consistent with the syndrome. *See* Dr. Jesse Fann, Report, March 27, 1993, attached hereto as Exhibit 14. In Ms. May's subjective Disability Report she stated her disabling condition was CFS, wasn't able to finish her work shifts, was resting all the time, was only able to stay awake for a maximum of 3-4 hours at a time, felt unsafe driving, and that her family had taken over 90% of the housework. *See* Disability Report, May 22, 1992, attached hereto as Exhibit 15. This was further

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)     (509) 271-3432 (F)

acknowledged by The Hartford's medical review psychologist, Nick DeFilippis, Ph.D., in his December 21, 2011 report. *See* Nick A. DeFilippis, Ph.D., Multidisciplinary Panel Review Report, attached hereto as Exhibit 16.

2.21.4  In 1992, Ms. May was referred to the Harborview Medical Center's Chronic Fatigue Clinic, where a review of Ms. May's symptoms and a physical exam revealed a spastic colon, tender breasts, sharp pain in the groin, sleep disturbances, poor concentration, as well as swollen joints on ankles and feet. *See* Chronic Fatigue Clinic notes, June 5, 1992, attached hereto as Exhibit 17. The clinic also reported a pattern of some good days and some bad days. *See Id.* The Chronic Fatigue Clinic continued to see Ms. May for the treatment of CFS, Insomnia, severe IBS, and depression. *See* Chronic Fatigue Clinic notes, July 6, 1992, attached hereto as Exhibit 18. During treatment at the clinic, the medical providers experimented with a series of treatment options and medications, including but not limited to, B-12 injections, Lodine, Imodiym Donnatal, Tigan, Trazodone, Prozac, counseling sessions, gastroenterologist, and physical therapy, etc. *See Id.*; *see also* Chronic Fatigue Clinic notes, September 4, 1992, attached hereto as Exhibit 19; Chehalis Physical Therapy, Progress Report, March 8, 1993, attached hereto as Exhibit 20. Ms. May continued to seek treatments at the Chronic Fatigue for years. *See* Chronic Fatigue Clinic notes, April 4, 1994, attached hereto as Exhibit 21.

2.21.5  The Hartford acknowledged at the time that Ms. May was diagnosed with CFS in 1992, she was seeing a specialist for it, she also had a spastic colon problem, and fatigue was so severe that she couldn't do her own shopping, heavy lifting, or much walking. *See* The Hartford Interoffice Memo, July 21, 1992, attached hereto as Exhibit 11. The Hartford was informed at this time that Ms. May's objective laboratory testing, as well as the Chronic Fatigue Clinic at Harborview Medical Center, had confirmed her CFS diagnosis. *See* Letter from Dr. Cooke to The Hartford, August 1, 1992, attached hereto as Exhibit 22; *see also* Letter from Dr. Cooke, November 3, 1992, attached hereto as Exhibit

COMPLAINT
P a g e  | 7

23. The Hartford's independent medical review psychologist, Nick DeFilippis, PhD, confirmed this letter stating Ms. May was unable to work because of CFS. *See* Multidisciplinary Panel Review, Nick DeFilippis, PhD, December 21, 2011, attached hereto as Exhibit 16.

   2.21.6  While continuing to seek treatment for on-going medical ailments of the aforementioned issues, Ms. May was diagnosed with Fibromyalgia. The Chronic Fatigue Clinic was the first to start recognizing symptoms and the possibility of a diagnosis. *See* Medical History Timeline, attached hereto as Exhibit 4. Dr. Cooke affirms the diagnosis of Fibromyalgia as one of the primary diagnosis for disability. *See* Letter from Dr. Cooke, April 12, 1998, attached hereto as Exhibit 24. Dr. Daryl Austin, Board Certified for internal medicine, confirmed the diagnosis of Fibromyalgia when Dr. Austin tested Ms. May for the multiple trigger points consistent with Fibromyalgia. *See* Dr. Daryl Austin medical report, April 25, 1998, attached hereto as Exhibit 10. The trigger points were also tested and confirmed again by Dr. Cooke in Ms. May's back, knees, and shoulders. *See* Attending Physician's statement of continued Disability, August 30, 2001, attached hereto as Exhibit 25. Again, the trigger points were tested and confirmed in the hands and back in 2006 by Dr. Cooke. *See* Dr. Cooke notes, June 22, 2006, attached hereto as Exhibit 26. The diagnosis of Fibromyalgia has been continually identified as an ongoing problem by Ms. May's treating medical team, and remains a limiting disability at the present time.

   2.22 **Initial and Continuous Receipt of Long-Term Disability benefits**

   2.22.1  Based on the aforementioned medical impairments, it was determined that Ms. May was unable to work as of March 9, 1992, and she began receiving LTD benefits under The Hartford policy as of June 10, 1992. *See* The Hartford interoffice memo, July 21, 1992, attached hereto as Exhibit 11. Ms. May also applied and began receiving Social Security Disability payments beginning in September of 1992. *See* Notice of Award, June 15, 1994, attached hereto as Exhibit 27. From that time, Ms. May

COMPLAINT
P a g e | **8**

1   continued to see her doctors, tried various treatments, and continued to suffer from the on-going medical

2   conditions of CFS, Fibromyalgia, IBS, and depression. *See generally* Medical History Timeline,

3   attached hereto as Exhibit 4. For nearly two decades, Ms. May's treating medical providers sent in the

4   required "Attending Physician's Statement," Ms. May sent in the required "Claimant Questionnaire" to

5   The Hartford for continuing disability, and The Hartford accepted her disabilities and diagnoses,

6   approving her for on-going LTD benefits. *See Id.; see also generally* Admin Timeline, attached hereto

7   as Exhibit 28.

8   

9   2.23 **Denial of LTD Benefits**

10   2.23.1  Despite Ms. May's continued and documented medical conditions, in 2010 the Benewah

11   Medical Clinic assigned her a new doctor, Dr. Cunningham Hartwig, because her primary care doctor,

12   Dr. Mullen, retired. The first time she met with Dr. Hartwig was on June 22, 2010 for issues related to

13   her depression and the doctor switched her medication from Prozac to Wellbutrin. *See* Dr. Cunningham

14   Hartwig office visit notes, June 22, 2010, attached hereto as Exhibit 29. A month later, on July 22, 2010,

15   The Hartford requested updated information from Ms. May to assess her continued disability, including

16   the annual Attending Physician Statement. *See* Letter from The Hartford to Ms. May, July 22, 2010,

17   attached hereto as Exhibit 30. Ms. May made an appointment with her new doctor, Dr. Hartwig, and

18   requested that she provide The Hartford with her Attending Physician Statement for Continued

19   Disability. *See* Dr. Hartwig office visit notes, August 9, 2010, attached hereto as Exhibit 31. While

20   acknowledging in her office visit notes that Ms. May was suffering from muscle pain associated with

21   Fibromyalgia, depression, anxiety, and insomnia, she refused to complete the Attending Physician

22   Statement because this was only her second time seeing Ms. May, she was "not able to assess the

23   duration the patient is capable of seeding, standing or weight the patient may be able to lift on a regular

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402, Spokane, WA 99201
(509) 868-5389 (T)      (509) 271-3432 (F)

basis." *See Id.* Additionally, she stated "I do not feel that a 15 or 30 minute appointment is adequate to assess these functions." *Id.*

2.23.2  Subsequently, Ms. May called the administrator's office at the Benewah Clinic, got a hold of John Rollins, and explained what had happened during her July 22, 2010 appointment with Dr. Hartwig. John Rollins explained he would see that someone would attend to her needs. Despite several phone calls and inquiries by Ms. May, Benewah Clinic never attended to the disability paperwork, and Ms. May was required to submit to The Hartford's required Ergo Physical Abilities Report. *See* Ergo Science Physical Evaluation, April 6, 2011, attached hereto as Exhibit 1.

2.23.3  Ms. May was also required at that time to attend an Independent Medical Examiner evaluation, performed by Dr. Jennifer James, MD. *See* IME report with Ms. May's hand-written notes, April 15, 2011, attached hereto as Exhibit 32. Dr. James is not a rheumatologist, but is board certified in Spinal Injury Medicine and Physical Medicine & Rehabilitation. *See* Dr. James' qualifications, attached hereto as Exhibit 33. Dr. James is a physiatrist who has a reputation of poor patient reviews, including complaints about the inadequacy of time the doctor had spent examining the patient during these medical exams. *See* Dr. James patient reviews, attached hereto as Exhibit 34. Ms. May rejected Dr. James' report and sent a copy of the Dr. James' report along with Ms. May's claimed contradictions to The Hartford. *See* IME report with Ms. May's hand-written notes, April 15, 2011, attached hereto as Exhibit 32. Close examination reveals Dr. James made blatantly false statements, such as: (1) Medical records show no documented diagnosis information confirming Fibromyalgia, (2) no tender points to substantiate Fibromyalgia, (3) Ms. May does not use any adaptive equipment, (4) no evidence of Epstein-Barr virus, a conclusion that Ms. May can sit up to 8 hours per day, (5) stand for 1 hour at a time, and up to 8 hours per day, (6) walk for 1 hour at a time, and up to 8 hours per day, (7) occasionally lifting 100 lbs, (8) capable of frequently lifting 50 lbs, (9) has never been seen by a gastrointestinal

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)      (509) 271-3432 (F)

specialist, and (10) ultimately restrictions and limitations are due solely to de-conditioning, not to a particular medical condition. *See* IME report with Ms. May's hand-written notes, April 15, 2011, attached hereto as Exhibit 32; *see also* Claimant Questionnaire, July 20, 2008, attached hereto as Exhibit 35; Dr. Thomas Cooke letter, April 12, 1998, attached hereto as Exhibit 24; Dr. Daryl Austin, medical report, April 25, 1998, attached hereto as Exhibit 10; Attending Physician's statement of continued Disability, Dr. Thomas Cooke, August 30, 2001, attached hereto as Exhibit 25; Attending Physician's statement of continued Disability, Dr. Bryon Stamm, July 28, 2008, attached hereto as Exhibit 36; Dr. Cooke, Lab Report, September 6, 2003, attached hereto as Exhibit 37; Dr. Cooke notes, September 8, 2003, attached hereto as Exhibit 38; Claimant Questionnaire, March 8, 2005, attached hereto as Exhibit 39; The Hartford Claimant Questionnaire, August 7, 2010, attached hereto as Exhibit 40; Physical Capacities Evaluation Form, Dr. Thomas Cooke, March 16, 2004, attached hereto as Exhibit 41; Physical Capacities Evaluation Form, Dr. Thomas Cooke, March 8, 2005, attached hereto as Exhibit 42; Physical Capacities Evaluation Form, Dr. Bryon Stamm, June 15, 2007, attached hereto as Exhibit 43; Office visit notes, Dr. Raymond Paz, August 10, 2012, attached hereto as Exhibit 44; Office Visit notes, Susan Hildebrandt, NP, January 17, 2011, attached hereto as Exhibit 45; Chronic Fatigue Clinic notes, September 4, 1992, attached hereto as Exhibit 19; Dr. O'Meara, Gastroenterology Notes, November 6, 1992, attached hereto as Exhibit 46; Dr. O'Meara Medical Report, May 10, 1999, attached hereto as Exhibit 47; see also generally Medical History Timeline, attached hereto as Exhibit 4.

2.23.4  In addition to these listed items, none of Dr. James' opinions are consistent with Ms. May's history of treatment. Ms. May refutes almost all of Dr. James' conclusions, most of which are not supported by Ms. May's voluminous history contained in her medical records. *See Id*. Ms. May contends Dr. James did not test most of the issues she made conclusions about, which is evident by the fact that she spent only about 5-10 minutes total examining Ms. May during the appointment. *See Id*. This

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)        (509) 271-3432 (F)

1  blatantly incorrect report played a fundamental role in and was relied upon in The Hartford's reasoning

2  for termination, as well as the conclusions reached by Dr. Chagnon and Nick DeFilippis, Ph.D.

3      2.23.5  During this period of time, Ms. May was referred to Susan Hildebrandt (hereinafter

4  "Hildebrandt"), NP at the Benewah Clinic to oversee her care. Ms. May informed Hildebrandt of her

5  need to be treated because of her disabilities, Hildebrandt acknowledged all Ms. May's ailments,

6  consented to overseeing Ms. May's continued treatment, never referred Ms. May to a specialist, nor did

7  she suggest Ms. May needed to see anyone else regarding her disabilities. *See* Medical History Timeline,

8  attached hereto as Exhibit 4. Hildebrandt directly contradicts herself and consent by informing Dr.

9  Chagnon in a Peer-to-Peer Discussion that she understood Ms. May "has Fibromyalgia, but she is not

10  treating her for this." *See* Multidisciplinary Panel Review, December 21, 2011, p. 6, attached hereto as

11  Exhibit 15. Additionally, Hildebrandt does not discuss Ms. May's on-going problems with CFS in her

12  discussion with Dr. Chagnon. *See Id.*

13

14

15      2.23.6  Ms. May began seeing Dr. Raymond Paz in 2012.

16      2.23.7  Ms. May continues to see Birgette Hager for counseling to deal with her on-going

17  depression. *See* Individual Therapy notes, Brigette Hager, January 22, 2103, attached hereto as

18  Exhibit 48.

19      2.23.8  Dr. Paz has been treating Ms. May for her many on-going ailments including IBS,

20  Fibromyalgia, and Chronic Fatigue Syndrome. *See* Dr. Paz Office Visit notes, July 15, 2013, attached

21  hereto as Exhibit 49; Dr. Paz Preventative Medicine Chart notes, September 9, 2013, attached hereto as

22  Exhibit 50; Dr. Paz Office Visit notes, October 24, 2013, attached hereto as Exhibit 51; Medical History

23  Timeline, attached hereto as Exhibit 4.

24      2.23.9  Specifically, Dr. Paz has completed a recent test for Fibromyalgia using the 18 point tender

25

26

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402, Spokane, WA 99201
(509) 868-5389 (T)      (509) 271-3432 (F)

test confirming her diagnosis. Dr. Paz Preventative Medicine Chart notes, September 9, 2013, attached

hereto as Exhibit 50. As well as, confirming her diagnosis of irritable bowel syndrome, and her chronic

issues with fatigue and depression. *See Id.*; Dr. Paz Office Visit notes, July 15, 2013, attached hereto as

Exhibit 49; Dr. Paz, Office Visit Chart Notes, September 26, 2013, attached hereto as Exhibit 52; Dr.

Paz Office Visit notes, October 24, 2013, attached hereto as Exhibit 51; Medical History Timeline,

attached hereto as Exhibit 4.

### III. FIRST CAUSE OF ACTION: BREACH OF CONTRACT

3.1     Plaintiff hereby incorporates and realleges paragraphs 1.1 through 2.23.9 as though fully

set forth herein.

3.2     Pursuant to the Life/Disability Program, attached hereto as Exhibit 2, Defendants owed

Plaintiff benefits for the reasonable payment of her long term disability, as documented by her treating

physicians and provided to Defendants, from August 18, 2011 through the present day.

3.3     Defendants breached their contract with Plaintiff by wrongfully denying her thoroughly

documented claims for LTD.

3.3     Plaintiff has suffered damages in an amount to be proven at trial, as a direct and

proximate result of Defendants' breach of the contract.

### IV. SECOND CAUSE OF ACTION: NEGLIGENCE

4.1     Plaintiff hereby incorporates and realleges paragraphs 1.1 through 3.3 as though fully set

forth herein.

4.2     The Defendants owed statutory, contractual and common law duties to the Plaintiff.

4.3     The Defendants, by and through their agents, employees and counsel have breached their

duties to the Plaintiff through negligent conduct in discharging those duties. The Defendants' failure to

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA 99201
(509) 868-5389 (T)      (509) 271-3432 (F)

pay the benefits owed was unreasonable, unfounded and arbitrary. Defendants' reliance on the conclusions of its employees rather than the professional medical conclusions of Plaintiff's treating physicians as so without foundation and so contrary to the requirements of Idaho insurers that the Defendants' claims representatives owed the Plaintiff a duty to pay notwithstanding the opinion.

4.4    The Defendants' negligence in discharging their duties has harmed the Plaintiff and has caused both economic and noneconomic harms, including but not limited to emotional distress, special damages, consequential damages, and attorney's fees in an amount to be proven at trial.

## V. THIRD CAUSE OF ACTION:
### BAD FAITH DENIAL OF BENEFITS UNDER 29 U.S.C. §502(a)(1)(B), §502(a)(3), §503, AND IDAHO LAW.

5.1    Plaintiff hereby incorporates and realleges paragraphs 1.1 through 4.4 as though fully set forth herein.

5.2    Plaintiff properly made a claim for LTD benefits under the Plan administered by Hartford Life and Accident Insurance Co.

5.3    Plaintiff exhausted the administrative appeals' process.

5.4    Defendants failed to comply with the procedural requirements set forth in 29 U.S.C. §503.

5.5    Defendants wrongfully and in bad faith denied Plaintiff's LTD benefits.

5.6    Plaintiff is entitled to benefits under the Plan's LTD benefits.

5.7    Plaintiff has and continues to suffer from well documented and diagnosed long-term medical ailments, resulting in her long-term disability.

5.8    There are two decades of documentation and evidence consisting of the Plaintiff's lab reports, doctors reports, and evaluations supporting a finding of disability were either merely noted, not given proper weight, or completely ignored. The result was Defendants made their termination of LTD

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)        (509) 271-3432 (F)

benefits determination based off three medical professionals' evaluations which were skewed, biased, and/or false.

5.9     Plaintiff has been wrongfully denied benefits owed to her.

5.10    Termination of Plaintiff's LTD benefits was arbitrary and capricious, without reason, and erroneous as a matter of law because (1) Defendant unjustifiably and improperly required more objective evidence to prove Plaintiff's disability, (2) periods of improvement are not dispositive evidence that a disability has improved, and (3) Defendant's supporting evidence is founded on erroneous findings.

5.11    As a direct result of Defendants' failure to allow and pay Plaintiff's claims for benefits, Plaintiff has been harmed emotionally and financially in amounts to be proven at trial. Plaintiff is also entitled to equitable relief, as appropriate and attorney fees and costs, pursuant to, but not limited to, I.C. section 41-1839.

## VI. FOURTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTIES

6.1     Plaintiff hereby incorporates and realleges paragraphs 1.1 through 5.11 as though fully set forth herein.

6.2     Defendants are Plan fiduciaries.

6.3     Defendants breached their fiduciary duties.

6.4     As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff suffered harms and losses in an amount to be proven at trial, in addition to her attorneys' fees and costs.

## VII. RESERVATION

Plaintiff reserves the right to amend this Complaint to add claims, which may exist, including but not limited to claims under RCW 48.30.

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402,  Spokane, WA  99201
(509) 868-5389 (T)        (509) 271-3432 (F)

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.  For all economic and non economic damages as may be proven at trial;

2.  For an award of punitive damages as allowed by law;

3.  For an award of Plaintiff's reasonable attorney's fees and costs incurred herein as allowed by federal and state law;

4.  For pre-judgment and post-judgment interest; and

5.  For such other and further relief as the Court deems just and equitable.

DATED this _____ day of February, 2014.

EOWEN S. ROSENTRATER, ISB No. 8581
*Attorney for Plaintiff*

LAW OFFICE OF EOWEN S. ROSENTRATER, PLLC
108 N. Washington St., Suite 402, Spokane, WA 99201
(509) 868-5389 (T)      (509) 271-3432 (F)

# Exhibit 1: Ergo Physical Work Performance Evaluation

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
| April 12, 2011 9:44:55 AM EDT | The Hartford - | 332 | 14 | Received |

2011-04-12 09:39    The Hartford -    860 843 4172 >>    P 1/14



PWPE™ Summary

## Physical Work Performance Evaluation™
Spokane Occupational & Hand Therapy
12121 E. Broadway # 6, Spokane Valley, WA 99206
866-779-6447 ext 203

*Please note that significant self-limiting behavior influenced test results.*

| Name: May, Patricia    INS. ID |
| Injury/Onset Date: / /    Claim# 14524 |
| Evaluation Date: 04/06/2011 |
| Test Start, End, Duration: 9:30 AM, 1:39 PM, 4:09 hours |
| Diagnosis: Fibromyalgia |
| Height, Weight: 64", 222lb |
| Starting BP, HR, Pain: 100/81, 86 bpm, Pain 4 out of 10 |

This report summarizes the results of the ErgoScience FCE Physical Work Performance Evaluation™. This evaluation is substantiated by reliability and validity research conducted at the University of Alabama at Birmingham and reported in the *Journal of Occupational Medicine*, September 1994[1]



**Minimal Overall Level of Work: Falls within the Light range.** Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exist 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible. The variable in this clients ability to return to a light level of work must take into account the history of anxiety and colon problems. The client describes the reason for being taken off of work was related to her colon problems with frequent trips to the rest room for a period of the work day. *Please note that the overall level of work was significantly influenced by the client's self-limiting behavior. Therefore, the Light level of work indicates a minimum ability rather than a maximum ability. A maximum overall level of work cannot be determined at this time due to the self-limiting behavior. Please see the Task Performance Table for specific abilities.*

**Tolerance for the 8-Hour Day:** Based on this evaluation, the client is incapable of sustaining the Light/ Sedentary level of work for the 8 hour day/ 40 hour work week due to endurance. This client would need to start back into a position with very limited hours and be able to slowly increase as tolerated do to being severely deconditioned. She would have to be able to take frequent breaks to relieve herself as noted above. *Please note that the tolerance for the 8-hour day was significantly influenced by the client's self-limiting behavior and indicates her minimal rather than her maximal ability.*

**Self Limiting Behavior:** *The client self-limited on 25% of the 12 tasks. Performance on the self-limiting tasks indicates a minimum rather than a maximum ability. A maximum on these tasks could not be determined due to the self-limiting behavior.* Self-limiting behavior means that the client stopped the task before a maximum effort was reached. Possible causes of self-limiting behavior include: (1) pain; (2) psychosocial issues such as fear of reinjury, anxiety, or depression; and/or (3) attempts to manipulate test results. Although it is difficult to determine the causes of self-limiting behavior, our research indicates that motivated clients self-limit on no more than 20% of test items. If the self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting test results.

- Self Limiting < 20% of tasks = Within normal limits[1]
- *Self-Limiting 21% to 33% of tasks = Exceeds normal limits[1]*
- Self-Limiting > 33% of tasks = Significantly exceeds normal limits[1]
[1]When compared to a motivated group of patients who participated in research.

**Self-Limiting Behavior**

25%

□ Full Participation
■ Self Limiting

[1] Lechner DE, et al. *Journal of Occupational Medicine*, September 1994 Volume 36, No. 9: pages 997-1004.

Copyright The UAB Research Foundation 1993. All rights reserved.



PWPE™ Summary
May, Patricia

## ADDITIONAL CLIENT STATEMENTS ABOUT SELF-LIMITING BEHAVIOR

The client's stated reasons for self-limiting behavior are listed beside each self-limited task in the Task Performance Summary section of this report.

## OBSERVED CLINICAL INCONSISTENCIES

- The following function to function inconsistencies were noted in the evaluation:
- Pain or pain behaviors were inconsistent with the observed deviations on the following tasks: 02-Climbing Stairs, 09-Sitting Tolerance, 22-Walking
- The following inconsistencies were noted between test items and casually observed behavior during the FCE.
  - Sitting tolerance was better during activities when not testing sitting tolerance. It still was significantly involved but position adjustments were fewer.
- **\*Difficult to determine if some of the tasks were contously made more difficult or anxiety aspect influenced her performance. This was mostly seen with handling and fingering activities.**

## IMPACT OF CLINICAL INCONSISTENCIES ON TEST RESULTS

- The observed clinical inconsistencies noted above minimally impacted the results of the client's FCE.
- The observed clinical inconsistencies noted above did not impact the FCE recommendations.

## RESULTS OF FORMAL CONSISTENCY OF EFFORT TESTING

- The Ergo Science FCE utilizes a formal consistency of effort protocol established and validated by Stokes et al.[2] In this protocol, three (3) different statistical calculations on grip strength testing data are performed. These results are then combined with any evidence of clinical inconsistencies or self-limiting behavior observed during the ErgoScience FCE. The final consistency of effort conclusion indicates the strength of all of this evidence combined.
- Combining the results of the clinical consistency comparisons, the presence of self-limiting behavior and the three formal consistency cross comparisons of the grip strength data, indicates that there is very weak evidence of low effort and inconsistent behavior. See addendum for details of the formal consistency of effort scoring criteria.
- Client was willing to attempt all tasks and weight added.

## SUBJECTIVE PAIN STATEMENTS

The client made the following subjective pain statements during the test:

- Oh, I don't like to focus on the pain, and try to block it out. The back is really fired up, spasming. The pain is better after resting. Im going to be painful later, but to be expected.
- These pain statements were consistent with the observed movement patterns.

## PAIN BEHAVIORS AND THEIR IMPACT ON TEST RESULTS

The client demonstrated the following pain behaviors during the test:

- Change of posture during tests; sit down or stand up; hands on low back; rub legs or arms.
- These pain behaviors were consistent with the observed movement patterns.
- These pain behaviors correlated with the client's self-reported pain.
- These pain did affect test performance

## OTHER EXTERNAL FACTORS THAT MIGHT IMPACT TEST RESULTS

- Psychological: Anxiety noted initially with elevated blood pressure 156/100 and heart rate at 110. She was restless and rubbed her hands on her thighs during initial interview.
- Comments made by her throughout the evaluation referred to herself as: I'm stupid; can't believe how poor shape I'm in; fat girl, I'm ashamed. Talked to self frequently throughout the examination.
- Symptoms increased when focused on them, but different then a self limiting behavior.



PWPE™ Summary
May, Patricia

### BODY MECHANICS AND MOVEMENT PATTERNS

The client did not demonstrate safe body mechanics and movement patterns during the test. Examples of the unsafe body mechanics and movement patterns are:

- Difficulty to perform a full squat, loss of vertical trunk alignment, box held away from body.
- All areas improved throughout the course of evaluation.

### BRIEF SUMMARY OF MEDICAL HISTORY

Onset of symptoms started in 1990 or 1991 for colon problems and later diagnosed with Fibromyalgia at a later date. She has received treatment with: Halation (weekly IV to remove lead and iron), Chronic Fatigue Program at Harbor View, Tried Natural Path, Use of multiple medications and four months of Physical Therapy which was reported to be stopped due to colon problems. None of the approached have given her long lasting relief.

### MEDICATIONS

| Medication | Dose | Frequency | Last Dose Taken |
|---|---|---|---|
| Bupropion ~ Depression | 150 mg | 2 times a day | today |
| Savella = Depression/fibromyalgia | 50 mg | 2 times a day | today |
| Omeprazole = acid reflux | 20 mg | 2 times a day | today |
| Amitriptyline HCL = sleep/antidepressant | 25 mg | At night | last night |
| Advil PM ≈ restless leg | 200 mg | at night | Last night |
| Mega Red = Omega 3 | Supplement | 1 x day | today |

### UPPER EXTREMITY FUNCTION

Client has a diagnosis involving the upper extremities. Ability to tolerate:

- Handling Frequently to Constantly
- Fingering Frequently to Constantly
- Reaching at Waist Occasionally to Frequently
- Reaching below Waist Occasionally to Frequently
- Feeling Frequently to Constantly

Client's right hand is dominant.

### BRIEF MUSCULOSKELETAL SCREEN

- **AROM:** Upper Extremity: Neck is stiff and sore, tilt to the right is the most limited.
- Shoulder Flexion R= 110, L= 120; Abduction R= 100, L110, Rotations are WFL
- Elbow, Forearm, Wrist, and Hands are WFLs.
- Lower Extremity: Tightness but are WFLs.
- Trunk: Tightness but WFLs. Limited by gain of weight per patient.
- **Strengthening:** 4+ to 5/5 throughout the upper and lower extremities.
- **LE Coordination/Balance:** Heal walk was 5 feet and difficult. Lose of balance.
- Toe walk is functional.

### TEST LENGTH AND REST BREAKS

The test lasted 4:09 hours. Short pauses of 2-3 minutes between tasks occur while the evaluator is setting up equipment and documenting scores. In addition to these naturally occurring rest breaks, 4 additional rest breaks were taken for a break total of approximately 7 minutes. 4 of these breaks were initiated by the client and the evaluator observed physiological signs of fatigue as well. The client also required 4 to 5 breaks to use the rest room between tasks; it is not in the scope of this evaluation to determine if these breaks were controlled or necessary.

2011-04-12 09:41     The Hartford -        860 843 4172 >>              P 4/14

 ErgoScience ™

PWPE™ Summary
May, Patricia

Unable=< 1 lb  Sedentary=1-10 lb  Light=11-20 lb  Medium=21-50 lb  Heavy=51-100 lb  V. Heavy= >100 lb



0%=Never    1%-33%=Occasionally    34%-66%=Frequently    67%-100%=Constantly



0%=Never    1%-33%=Occasionally    34%-66%=Frequently    67%-100%=Constantly



2011-04-12 09:41    The Hartford -        860 843 4172 >>                    P 5/14



PWPE™ Summary
May, Patricia

| TASK PERFORMANCE |

*Please note that the results noted below in red italics and marked SL are tasks on which the client self-limited. On these self-limiting tasks, the performance represents a minimal rather than a maximal performance. On these tasks we cannot determine a maximum performance.*

| Tasks | Client Performance [1] | Self-Limiting Reasons | Maximum Abilities [1] |
|---|---|---|---|
| Floor to waist lift | 16 lb Occas. | | 16 lb Occas. |
| Two handed carrying | 16 lb Occas. | | 16 lb Occas. |
| Pushing | 32 lb Occas. [3] | | 32 lb Occas. [3] |
| Pulling | 30 lb Occas. [3] | | 30 lb Occas. [3] |
| Sitting | Occasionally | | Occasionally |
| Standing | Occasionally | | Occasionally |
| Work bent over-standing/stooping | Never | | Never |
| Work kneeling | Never | | Never |
| Climbing stairs | *Occasionally-SL* | Fatigue | ? |
| Repetitive squatting | *Occasionally-SL* | Pain | ? |
| Walking | Frequently | | Frequently |
| Crawling | *Occasionally-SL* | Pain | ? |
| Balance on level surfaces | Adequate | | Adequate |
| Manual Dexterity [2] | 1 | | 1 |
| Finger Dexterity [2] | 5 | | 5 |
| Forward Reaching | Frequently | | Frequently |

[1]  Occasionally – up to 1/3 of the day, Frequently – 1/3 to 2/3 of the day, Constantly – 2/3 to the full day.  Frequent lifting – 50% of Occasional; Constant lifting – 20% of Occasional.

[2]  D.O.T. The aptitudes:  1 (90-100 percentile), 2 (67-89 percentile), 3 (34-66 percentile), 4 (11-33 percentile), 5 (0-10 percentile).

[3]  Pounds of force is the amount of force the client exerted during the pushing and pulling tasks.  If pushing or pulling is required for work, the force required for the task should be measured with a force gauge for comparison.

2011-04-12 09:42     The Hartford -       860 843 4172 >>         P 6/14

**ErgoScience**                              PE⁷ ummary
                                                        May, Patricia

## MAJOR AREAS OF DYSFUNCTION
- Dynamic Strength
- Position Tolerance
- Functional Endurance

## FACTORS UNDERLYING PERFORMANCE
- Generalized de-conditioning
- Pain in low back (Neck, shoulders,hands,feet,thighs)
- Generalized fatigue
- Fear of re-injury
- When symptoms were focused upon they became increased.
- Self degrading comments.

## EXIT INTERVIEW
- Closing Comments: I think we have every muscle possible fired up today, I know you have to do it to see how I'm doing. Back really fired up but after resting starting to relax a little.
- Movement was stiffer at end of evaluation and she appeared physically exhausted.
- Pain Score: 7
- Gait pattern leaving the evaluation is slower and more labored compared to gait pattern used upon arriving for test.
- Client reports a significant amount of weight gain since she has been off of work.
- Frequent restroom breaks taken throughout the examination.
- The client was driven to the evaluation by her husband.

Evaluator: Clint Hubbard OTR/L, CHT, PWPE
Phone:     866-779-6447 ext 203

May1753

 **ErgoScience**™

PWPE™ Summary
May, Patricia

---

| Consistency of Effort Testing and Conclusion |
| --- |

The ErgoScience FCE utilizes a formal consistency of effort protocol established and validated by Stokes et al.[2]  In this protocol, three (3) different statistical calculations on grip strength testing data are performed.  These results are then combined with any evidence of clinical inconsistencies or self-limiting behavior observed during the ErgoScience FCE.  The final consistency of effort conclusion indicates the strength of all of this evidence combined.

**Statistical Test 1.**
**Right Hand**
The standard deviation of sustained maximum right grip strength across 5 handle positions was 8.05, indicating a normal bell shaped curve and maximum effort on the bell shaped curve test for the right hand.[2]

**Left Hand**
The standard deviation of sustained maximum left grip strength across 5 handle positions was 9.40, indicating a normal bell shaped curve and maximum effort on the bell shaped curve test for the left hand.[2]



**Statistical Test 2.**
The Rapid Exchange Grip (REG) is 0 pounds different from the peak slow sustained grip.  Clinical studies demonstrate[2] that this difference is not significant and indicates that the client exerted maximum effort.

**Statistical Test 3.**
A regression analysis was calculated based on the peak effort of sustained grip and the maximum REG.  This calculation indicates that the patient gave a maximum effort on grip strength tests.[2]

**Self-Limiting Behavior**
Self-Limiting behavior was > 20%.

**Clinical Inconsistencies**
No additional significant clinical inconsistencies were noted during the FCE.

**Conclusion Regarding Consistency of Effort.**  Combining the results of the clinical consistency comparisons, the presence of self-limiting behavior and the three formal consistency cross comparisons of the grip strength data, indicates that there is very weak evidence of low effort and inconsistent behavior.[2]

[2]Stokes, HM et al. Identification of Low-effort Patients Through Dynamometry. Journal of Hand Surgery. Vol 20A, No 6, November, 1995, pp. 1047 – 1055.

2011-04-12 09:43     The Hartford -      860 843 4172 >>          P 8/14



PWPE™ Summary
May, Patricia

---

**Conditions for Positive Results (indicating low effort) on Statistical Calculations:**

1) SD of 5-position grip testing on right or left grip of ≤ 7.5
2) Difference between REG and peak grip of 5-position grip testing of ≥ 12 lb.
3) Regression equation results of ≥ 3.5

**Criteria for Consistency of Effort Conclusion:**

1) Significant clinical inconsistencies *or* SL behavior [1] present + all 3 statistical calculations are positive = **Very Strong evidence of low effort and inconsistent behavior.**
2) Significant clinical inconsistencies *or* SL behavior [2] present + 2 of the 3 statistical calculations are positive = **Strong evidence of low effort and inconsistent behavior.**
3) Significant clinical inconsistencies *or* SL behavior [2] present + 1 of the 3 statistical calculations are positive = **Significant evidence of low effort and inconsistent behavior.**
3a) Significant clinical inconsistencies present + 0 (none) of the 3 statistical calculations are positive = **Significant evidence of low effort and inconsistent behavior.**
4) No significant clinical inconsistencies *and no* SL behavior [2] present + all 3 statistical calculations are positive = **Moderate evidence of low effort and inconsistent behavior.**
5) No significant clinical inconsistencies *and no* SL behavior [2] present + 2 of the 3 statistical calculations are positive = **Weak evidence of low effort and inconsistent behavior.**
6) No significant clinical inconsistencies *and no* SL behavior [2] present + 1 of the 3 statistical calculations are positive = **Very Weak evidence of low effort and inconsistent behavior.**
6a) No significant clinical inconsistencies *but* SL behavior [1] present + 0 (none) of the 3 statistical calculations are positive = **Very Weak evidence of low effort and inconsistent behavior.**
7) No significant clinical inconsistencies *and* no SL behavior [2] present + 0 (none) of the 3 statistical calculations are positive = **No evidence of low effort and inconsistent behavior. Patient gave full/maximum effort on all aspects of the test.**

---

## DATA DETAILS

**Note: For each task, client participation is rated as:**

Appropriate – Client and therapist agree on stopping task. Full, physical effort given.

Overextending – Therapist stops task. Client willing to continue despite maximum being reached. Full, physical effort given.

Self-limiting – Client stops task before objective signs indicate that a maximum physical effort has been reached.

**Lift - Floor to Waist - Appropriate**
- Completed 16 lb safely
- Pain Score = 6.00
- Pain Location = Low back and shoulder
- Ending HR = 130

Signs of Effort
- Accessory Muscles
- Decreased Box Control
- Increased Time to Complete Repetitions
- Vertical Trunk Alignment Decreases

**Climbing Stairs - Self-Limiting**
- Completed 60 of 100 - 60% of task
- Pain Score = 6.50
- Pain Location = Low back, thighs
- Ending HR = 133
- Within Normal Limits

**Repetitive Squatting - Self-Limiting**
- Completed 12 of 25 - 48% of task
- Pain Score = 7.00
- Pain Location = Low back, feet and shoulders
- Ending HR = 127
- Moderate Deviations



**PWPE™ Summary**
May, Patricia

o Unable to Assume Full Squat
o Loss of Vertical Trunk Alignment

**Bilateral Carry - Over-extending**
- Completed 16 lb safely
- Pain Score = 7.00
- Pain Location = low back,sh,feet,thighs
- Ending HR = 131
Signs of Effort
- Hands Slip/Difficulty Holding Box
- Decreased Box Control
- Irregular Gait
- Increased Time to Complete Repetitions
- Cadence Quickens
- Shorter Steps

**Maximum Dynamic Pushing - Appropriate**
- Completed 32 lb safely
- Pain Score = 8.00
- Pain Location = low back,blades,sh,feet, thighs,neck
- Ending HR = 132
Signs of Effort
- Face Red/Perspiration
- Accessory Muscles
- Forward Lean Increases
- Toe Walking (Loses Heel-Strike)
- Increased Time to Complete Repetitions
- Uses Chest Against Sled
- Progressive Wrist Extension

**Maximum Dynamic Pulling - Appropriate**
- Completed 30 lb safely
- Pain Score = 8.00
- Pain Location = low back,blade, thigh,tricep, hands, neck
- Ending HR = 127
Signs of Effort
- Face Red/Perspiration
- Accessory Muscles
- Increased Time to Complete Repetitions
- Other

**Sitting Tolerance - Appropriate**
- Completed 5:00 of 5:00 minutes - 100% of task
- Position Adjustments = 6
- Pain Score  1 Min = 7
- Pain Location  1 Min = Low back, neck, hands
- Minimal Deviations
  o Lateral Trunk Shift (Right or Left)
  o adjust shoulders and neck, reposition arms.

**Standing Tolerance - Appropriate**
- Completed 5:00 of 5:00 minutes - 100% of task
- Position Adjustments = 12
- Pain Score  1 Min ~ 8
- Pain Location  1 Min = Low back,neck,sh,feet,hands minimal
- Moderate Deviations

May1756

2011-04-12 09:43      The Hartford -       860 843 4172 >>          P 10/14

 **ErgoScience**™

**PWPE**™ **Summary**
May, Patricia

o Decreased Weight Bearing on One Leg
o Lateral trunk Shift (Right or Left)
o Increased Hip and Knee Flexion (Bilateral or Unilateral)

**Work Bent Over / Stooping - Over-extending**
- Completed 3:00 of 5:00 minutes - 60% of task
- Position Adjustments = 9
- Pain Score   1 Min = 8  3 Min = 8.50
- Pain Location   1 Min = Low back,blades, neck,hands, thighs  3 Min = Low back,blades,neck,hands, thighs
- Severe Deviations
  o Decreased Weight Bearing on One Leg
  o Lateral Trunk Shift (Right or Left)
  o Increased Hip and Knee Flexion (Bilateral or Unilateral)
  o Weight Bearing with Hand
  o Using Table to Support Thighs

**Kneeling - Over-extending**
- Completed 3:28 of 5:00 minutes - 69% of task
- Position Adjustments = 12
- Pain Score   1 Min = 7.50  3 Min = 8
- Pain Location   1 Min = Low back,blades,neck  3 Min = Low back, blades, neck
- Severe Deviations
  o Decreased Weight Bearing on One Leg
  o Lateral Trunk Shift (Right or Left)
  o Increased Hip Flexion with Anterior Pelvic Tilt
  o Weight Bearing with Hand

**Walking - Appropriate**
- Completed 500 of 500 - 100% of task
- Pain Score = 8.00
- Pain Location = Low back,hips,feets,thigh,blades,neck
- Ending HR = 120
- Within Normal Limits

**Crawling - Self-Limiting**
- Completed 40 of 50 - 80% of task
- Pain Score = 8.00
- Pain Location ≈ Neck,knees, wrists,hands,back,sh
- Ending HR = 119
- Minimal Deviations
  o Decreased Weight Bearing on Palms

**Modified Purdue Pegboard - Appropriate**
- Pain Score = 8
- Pain Location = low back,sh blades, hands
- Percentile Score  Left = 0%  Right = 0%
- DOT Aptitude Score  Left = 5  Right = 5
- Within Normal Limits

**Minnesota Manual Dexterity - Appropriate**
- Pain Score = 7
- Pain Location = Back and shoulders
- Percentile Score  Left = 93%  Right = 93%
- DOT Aptitude Score  Left = 1  Right = 1
- Within Normal Limits

2011-04-12 09:43 The Hartford - 860 843 4172 >> P 11/14



PWPE™ Summary
May, Patricia

May1758



# GENERAL PRE-TEST INSTRUCTIONS & ACKNOWLEDGEMENT

**These instructions are read to the client prior to the beginning of the test:**

- You are going to be tested on your ability to perform tasks which require you to use your strength, assume various positions, and perform repetitive movements. In addition, I will briefly evaluate your balance and coordination. I will ask you to repeat the first 3 of the tasks that you do at the end of the test to determine your endurance. The purpose of this test is to determine your safe physical limitations for performing work. I want you to perform to the best of your ability on all tasks. However, I do not want you to hurt yourself by overdoing it on this test. The tasks were designed to challenge everyone to give their maximal safe physical effort. Therefore, you may not be able to complete all the tasks. Although this is not a test that you pass or fail, we are looking for your best physical effort. The results of your performance will be reported in terms of what you can do safely."

- "Throughout the test, I want you to let me know if any of the tasks cause you pain or significantly increases any pain that you already have. You may stop yourself at any time during the test. I will be observing you for physical signs that you have reached your maximum effort. For each of the tasks, there are specific signs that indicate when a person has reached a safe physical maximum effort. Once these signs are evident, I will stop you and will not let you go past the point of your safe maximum."

- "You can choose to stop yourself before I observe the signs of maximum effort and I will respect your decision. There are good reasons for your stopping a task, such as: joint or muscle pain, chest pain, shortness of breath, dizziness, or fear of re-injury. You are the best judge of your body's abilities. Do not allow my observations to pressure you into continuing if you really feel you should stop. Pain is to be respected and if it builds up too much, you may choose to stop even if you have not reached your maximum. I will document that you stopped yourself on that particular task. You will not be forced to do anything which you do not feel capable of doing."



- "However, it's important for you to know that if I ask you to perform a task that you do not think you can perform, it's best that you at least attempt that task. Then, I can observe and document that you could not do it rather than documenting that you refused to try it."

- "You may experience some stiffness and/or soreness from this test, especially if you have been somewhat inactive for a period of time. This is the same type of stiffness and soreness that you would feel if you went out and played a sport that you had not played in a long time; or did homework or yard work for the first time in several months. This stiffness and soreness is a normal response and will probably disappear in approximately twenty-four to forty-eight hours."

- "Before you begin lifting any weights, I would like to observe the way you lift the empty box. I want to make sure you are lifting safely for the test. Do you have any questions?"

**Please be aware that neither ErgoScience nor this clinic is authorized to provide you or anyone else with a copy of the FCE report from this evaluation. To obtain a copy of the FCE report, please contact your claims adjuster or case manager directly.**

I, ___PATTY MAY_____, acknowledge understanding the preceding verbal instructions read to me regarding the Physical Work Performance Evaluation.

Signature ___P. May_____ Date: __4-6-2011__

# Exhibit 2: Life/Disability Program Manual


**Washington
Natural Gas**

# Life/Disability
# Program

# Table of Contents

Your Group Insurance Plan. . . . . . .  3
Life Insurance. . . . . . . . . . . . . . . . .  4
Long Term Disability Income . . . . .  5
General Provisions. . . . . . . . . . . . . 11
General Plan Information . . . . . . . . 12
How to Obtain Plan Benefits . . . . . 13
Special Disclosure Information . . . 14

Puget
Sound

Lots of
endorsements
added to
end.

1

# Your Group
# Insurance Plan

This Group Insurance Plan has been designed to provide you with a measure of protection for your family in the event of your death or loss of earning power due to accident, sickness or serious disability.

As a regular full-time employee working 40 or more hours per week, you will be covered by this Plan on the first of the month coincident with or following 6 months of continuous employment, provided you have made proper application. You enroll upon the date of employment. If you are not actively working on the day you are to be insured, your Life Insurance coverage will be delayed until you complete one day of full-time employment. Your Long Term Disability coverage will be delayed until you have completed 3 weeks of full-time employment.

3

# Special Notes

This booklet briefly discusses the Group Insurance Program provided in the master contracts issued by United of Omaha Life Insurance Company and Hartford Life and Accident Insurance Company. In case of conflict between the wording of this booklet and the contract, the wording of the contract will govern.

The Company expects to continue the Plan indefinitely, but must necessarily reserve the right to change, or possibly discontinue, the Plan.

Benefit Revision 10/1/91

2

Life Insurance —

# United of Omaha Life Insurance Company
## Policy No. GLUG 2A36

### Amount of Benefit

Life Insurance — One and one-half times annual earnings*

Earnings constitute your regular income including commissions paid to sales representatives but excluding any bonuses, overtime or special pay, and the Company's cost for any public or private employee benefit plan, including this Plan.

The amount of Life Insurance will not exceed a maximum of $400,000. If you are actively at work on your 65th birthday, your benefit will be reduced by 25%.

In the event of death from any cause, the insurance proceeds are payable to anyone you name as beneficiary. You may name any beneficiary you wish and change your beneficiary at any time. You may also select the method in which your insurance will be paid — in installments or in a single sum.

### Waiver of Premium

Your Life Insurance will be kept in force under the provisions of the plan without cost to you, as long as you continue to be totally disabled and unable to work up to age 65. You must apply for this continuation of coverage after 9 months of total disability, and no later than 1 year from the date your active service ends because of the disability. You must periodically provide proof, satisfactory to the insurance company, that you continue to be disabled. Then, the provisions governing "Life Insurance After Retirement" apply.

### Life Insurance After Retirement

After your retirement, the Company will continue to provide, at no cost to you, certain amounts of Life Insurance. Upon reaching your retirement date, your Life Insurance will decrease by 25%, and on each succeeding anniversary date of the retirement, it will be reduced by an additional 25% of the original amount, until a minimum of $2,000 has been reached. This amount will remain in force, without further reduction, until the time of claim, so long as the policy continues in force and premiums are paid by the Company when they are due.

### Conversion

If you terminate employment, your Life Insurance will remain in force for 31 days. During this time you may obtain an individual policy in the same amount of your coverage without taking a medical examination, by applying to the insurance company for one of its permanent plans.

*Your total benefit will be reduced by the amount of group term insurance provided by any negotiated health and welfare plan.

4

# Long Term Disability Income —

# Hartford Life and Accident Insurance Company

## Policy No. G49117

### Long Term Disability Income Insurance

This is a summary of the principal features of your plan of benefits provided by the Group Insurance Policy issued by the Hartford. In the event of any variations between the information in this summary and the provisions of the Group Policy, the policy will prevail.

This Plan partially replaces lost income on or off the job. In order to receive this benefit, your disability must be caused by an injury, sickness or pregnancy covered by the Policy and extend beyond the qualifying period shown in the Insurance Schedule.

The qualifying period will not be interrupted, if:

1. you are totally disabled, return to full-time work (at your regular occupation or employment), for a limited period, and then again become disabled. This limited period cannot exceed the number of days (15) in the Qualifying Period Interruption Duration; or

2. you are totally disabled and engage in limited employment.

Total disability will be considered to continue during these limited returns to work.

### Amount of Benefit

Eligible employees, who become totally disabled while insured and remain totally disabled for 3 consecutive months while under the care of a licensed physician, will receive a monthly income beginning with the 91st day of disability equal to 60% of their base monthly earnings* and a maximum monthly benefit of $6,800.

The benefit will be directly reduced by any earnings acquired during the period of disability; retirement benefits or benefits from any group policy; Social Security benefits (benefits will be reduced by dependent spouse Social Security benefits, but not those of dependent children); Worker's Compensation; or other benefits provided by law with the exception of military service. In no event will the Long Term Disability income from this Plan, when combined with all other sources of disability income (Social Security, Worker's Compensation, etc.) exceed 70% of base monthly earnings. If you are disabled for any period of less than a month, your benefits will be pro-rated.

5



## Illustration of
## Long Term Disability Benefits

| If Your Monthly Earnings Are: | Your Monthly Benefit, Including Social Security and Other Benefits of a "Group" Nature is: |
|---|---|
| $ 900 | $ 540 |
| 1,200 | 720 |
| 1,500 | 900 |
| 1,800 | 1,080 |
| 2,100 | 1,260 |
| 2,400 | 1,440 |
| 2,700 | 1,620 |
| 3,000 | 1,800 |

*Monthly earnings are your regular earnings including commissions paid to sales representatives, but excluding any bonuses, pay for overtime or special pay, and excluding the Company's cost for any public or private employee benefit plan including this Plan. If you are an hourly employee, your monthly earnings will be based on your hourly rate of pay, subject to a maximum of 40 hours per week.

## Definition of Total Disability

Occupation Test (Total Disability).
During the first 24 months of a disability, you are totally disabled if you are under the care of a licensed physician and are unable to perform the material duties of your regular job. After 24 months, you will continue to be considered totally disabled if you cannot work at any job for which your education, training and experience qualify you.

Earnings Test (Partial Disability).
If you are not disabled as under the Occupation Test definition from doing all the material and substantial duties of your own occupation on a full-time basis, you will be considered as totally disabled if:

1. you are performing at least one of the material duties of your own occupation on either a full-time or part-time basis;

2. you are under the regular care of a physician; and

3. you are currently earning at least 20% less per month than your Indexed Pre-disability Earnings due to the same injury or sickness that caused the disability.

In determining Monthly Earnings under the Earnings definition, wages, salary, commissions, and similar pay from gainful work will be included, whether payment will be pro-rated over the period of time for which the payment accrued.

The Monthly earnings figure used to determine total disability is increased by 7.5% on each anniversary of the date of disability for the duration of the disability. This amount is used solely to determine total disability until the next anniversary.

## Benefit Duration

Benefits will be paid during the period of disability as outlined on pages 6 and 7.

## Maximum Duration of Benefits

The Maximum Duration of Benefits is the entire period of disability, except that benefits will not accrue beyond:

1. the day before you attain the Social Security Normal Retirement

6

*There is an updated definition towards back of packet*

Age, if the period of disability begins prior to age 60; and

2. the later of (i) the day before you attain the Social Security Normal Retirement Age, and (ii) 36 consecutive months of total disability following the end of the qualifying period, if the period of disability begins on or after age 60 but prior to age 65; and

3. the earlier of your 70th birthday, and 24 consecutive months of total disability following the end of the qualifying period, if the period of disability begins on or after age 65 but prior to age 70. However, if you attain age 69 before the end of the qualifying period, the Maximum Duration of benefits is 12 consecutive months of total disability following the end of the qualifying period.

## Rehabilitative Benefit

Rehabilitation. To encourage your recovery from total disability, the Plan contains a special rehabilitation pro-

vision. If you return to work on a limited basis as part of a rehabilitation plan recommended and supervised by a licensed physician (other than yourself), the goal of which is to return you to full-time, gainful employment, and you remain under his care and attendance, you will still be considered to be totally disabled.

Benefits will not be paid until the Qualifying Period ends and will not be paid after the Maximum Duration of Benefit shown in the Insurance Schedule. 70% of any income you are entitled to receive form this limited employment will be considered in determining the Monthly Payment Limit.

## Effective Date

Your insurance will become effective as soon as you have completed the eligibility period, provided you have signed your application and enroll-

ment authorization card and are actively at work.

## Recurrent Disability

A 90-day waiting period must be satisfied for each unrelated disability. However, if you have previously received benefits under the Plan and have become disabled again for the same or related causes, and both disabilities are separated by your return to work for less than 6 months, then both disabilities will be considered one disability. You will not need to satisfy another 90 day waiting period.

## Monthly Payment Limit

If you receive or are eligible to receive payments from the sources described below, the total of those benefits will be added to your monthly LTD benefit and any benefits determined under the Offset Amount. If the combined total of these benefits is more than 70% of your former

7

monthly earnings, your LTD benefit will be reduced by the amount in excess of 70%.

These other benefits are:

1. 70% of any salary, wages, commissions or similar payments received after reduction by a Child Care Expense.

Child Care Expense means any expense you may have for the care of one or more dependent children while you return to work during a disability. The children must be under age 15 or be incapable of earning their own living because of a physical handicap or mental retardation and be dependent on you for support and maintenance. The care must be provided by someone other than your relatives and not exceed $250 a month per child or a pro-rated amount for any lesser period.

2. Loss of time benefits provided by any non-employer sponsored group insurance contract.

3. Any disability benefits provided by no-fault motor vehicle laws, except when the amount of the "no-fault" benefit is based on the amount of this Plan's benefit.

If it is likely that you or any of your dependents are eligible for any of the benefits listed above, Hartford Life and Accident will compute your Long Term Disability benefit based on them, even if you have not yet applied for them or if our claim is still pending.

Monthly payments to you will not be affected by statutory or cost of living increases in Social Security benefits after monthly benefits start. This freeze also applies to retirement plans, and to benefits received under state cash sickness plans, the U.S. Railroad Retirement Act, Canadian Pension Plan, the Maritime Doctrine of Maintenance, Wages and Cure, or similar legislation.

If you have received a one-sum payment from any of the sources specified under the Offset Amount or Monthly Payment Limit, the one-sum payment will be allocated as if it had been received on a periodic basis.

**Minimum Benefits**

You will receive a minimum monthly benefit of $50 no matter how much income you receive from other sources. If you are disabled for less than a full month, you will receive an adjusted amount for each day you are disabled.

**Right of Recovery**

If a disability is incurred for injuries received in an accident for which, in the opinion of Hartford Life and Accident, a third party may be liable, Hartford Life and Accident will pay the amount of benefits due. However, you must first agree in writing to refund the lesser of:

1. the amount actually paid by Hartford Life and Accident; or

8

2. an amount equal to the sum received from the third party for disability income;

at the time such third party liability is determined and satisfied; whether by judgment, settlement, arbitration, or otherwise.

## Conversion Privilege

If your Long Term Disability Insurance is terminated, you may be able to convert to coverage provided under a Group Long Term Disability Insurance Conversion Policy. You must have been insured under the Plan for at least 1 year. This 1 year period includes time you were insured under any group policy providing similar benefits, which the Plan replaces.

You must, within 31 days of termination:

1. apply in writing to participate under the Conversion Policy.

2. pay the first quarterly premium to Hartford Life and Accident Insurance Company.

You are not required to furnish evidence of insurability.

You will not be able to convert if your insurance under the Plan is terminated because:

1. the policy is terminated; or

2. the policy is amended to terminate LTD insurance coverage for you; or

3. you are totally disabled as defined in the Definition of Total Disability; or

4. you fail to pay, when due, any required contribution for the cost of insurance under the plan; or

5. you retire from employment with the Policyholder.

The benefits terms, and conditions of the Conversion Policy will be those which are offered for conversion at the time you apply. The premium for the Conversion Policy will be based on the premium rates in effect at the time you apply. The effective date of coverage under the Conversion Policy will be the day following the date your insurance under the Plan terminates.

## Survivor Benefits

If your death occurs after you have fulfilled the Qualifying Period, but prior to the expiration of the Maximum Duration of Benefits (as defined above), a Survivor Benefit will be paid to your spouse, if living; otherwise equally to your surviving children. To be eligible, a child, at your death, must be less than age 21 and unmarried. The term "child" is to include a stepchild, foster child, and adopted child, provided such child is dependent upon you for support and maintenance. This benefit is payable for three months.

## Exclusions

The Long Term Disability Plan does not cover disability caused or contributed to by any of the following:

9

1. Self-inflicted injury, or any attempt at suicide, whether the employee is sane or insane.

2. War or acts of war, whether declared or undeclared.

3. There are limitations on the payments of benefits for a disability caused by a nervous or mental condition, alcoholism, drug addiction, or chemical dependency:

- Benefits for all periods of disability caused by nervous or mental disorders, alcoholism, drug addiction, or chemical dependency are only payable for 24 months if you are not in a hospital.

- Regular benefits are payable while you are in a hospital if confinement starts within 3 months after the end of the qualifying period, or within 6 months after discharge from a prior confinement during which time benefits were payable. Also, benefits are payable for any confinement in a hospital that starts during the 24 months when out-of-hospital benefits are payable.

A "hospital" is an institution which has a medical staff of licensed physicians and has 24-hour nursing services. The hospital must operate within the law and it must not specialize as a rest home, convalescent home, or a place for the elderly.

4. Commission of a crime; i.e., felony resulting in a conviction.

5. A condition for which you received medical care including taking of prescribed drugs or medicines, within 6 months before you become insured unless the condition contributes to a disability which commences: (1) after you have received no medical care for that condition for a 6 month period ending while insured; or (2) after you have been continually insured as an active, full-time, employee for 12 consecutive months.

10

# General Provisions

## Enrollment

To become a member in the Group Insurance Plan you must complete the special enrollment cards for each Plan and return them to your personnel representative.

## Salary Changes

Your benefits will change automatically whenever your salary changes, if you are actively at work on that day; otherwise, on the day you return to active work.

## Termination of Coverage

Your coverage will terminate on the earliest of the following dates:

1. When your employment with the Company terminates.

2. When you are no longer a full-time employee.

3. On the date the Plan is discontinued.*

4. On the date you enter the armed service of any country, unless you are a member of the reserves and are called to active duty for a training period not exceeding one month from the date entered.

*Benefits to continue for those totally disabled.

11

# General Plan Information

**Name of Plan**

Group Insurance Plan for eligible employees.

**Type of Plan**

The Plan is a Welfare Plan that provides Life Insurance and Long Term Disability Income benefits.

**Plan Sponsor**

Washington Natural Gas Company
815 Mercer Street
Seattle, Washington 98111
Telephone: (206) 622-6767

**Employer Identification Number and Plan Number**

EIN: 91-1005303
Plan Number: 502

**Type of Administration**

This plan is administered directly by the Plan Administrator with benefits provided in accordance with provisions of the Group Insurance Policies issued by United of Omaha Life Insurance Company and Hartford Life and Accident Insurance Company.

**Plan Administrator**

Administrative Committee
Washington Natural Gas Company
815 Mercer Street
Seattle, Washington 98111
Telephone: (206) 622-6767

**Agent for Service of Legal Process**

Administrative Committee
Same as above

**Source of Contributions**

Contributions are paid entirely by Washington Natural Gas Company.

**Entities Used for the Accumulation of Assets and Payment of Benefits**

Premuims are paid to and benefits are paid from United of Omaha Life Insurance Company and Hartford Life and Accident Insurance Company.

**Plan's Fiscal Year End**

March 31 for Life insurance and September 30 for Long Term Disability insurance.

12

# How to Obtain
# Plan Benefits

## Life Insurance

For instructions and the necessary forms required to file for Life Insurance benefits, contact the Personnel Department.

## Long Term Disability Benefits

Secure a claim form from the Personnel Department. Complete the form and return it with the doctor's certification pertaining to your particular illness or injury to the Personnel Department. If disability extends beyond the period covered by the first claim report, continuing disability claim reports may be required and should be forwarded to the Personnel Department or the Insurance Company as requested.

## Claim Denial

If a claim is denied, in whole or in part, you will be advised of the reason for denial including reference to pertinent plan provisions, your right to have the denial reviewed, and the procedure to be followed to obtain review of the denial. If a claim is incomplete, you will be advised of any additional material or information needed to perfect the claim, including an explanation of why such material or information is needed. You will ordinarily receive payment or other response on a claim within 90 days from the date the claim was filed. However, if special circumstances require additional time, you will be notified of this during the 90 days following receipt of your claim, *along with an explanation of the special circumstances requiring an extension of time and the date by which a final decision is expected.*

## Review Procedure

If you wish to have a claim denial reviewed, you must request the review within 60 days after *your receipt* of the claim denial. The *request may be in writing.* Contact the Plan Administrator for assistance with the review. As part of the review you have the right to see all plan documents and other papers which affect the claim, to argue against the denial in writing and to have a representative if desired. However, the insurance company will have the final decision as to whether a claim is payable to you. You will ordinarily be notified *in writing* of the insurance company's final decision *along with the specific reasons for the decision and specific references to the pertinent plan provision* within 60 days from receipt of your request. If special circumstances require an extension of time, you will be notified *in writing* of such extension during the 60 days following receipt of your request.

13

# Special Disclosure Information

The Department of Labor requires that you be provided with the following statement and list of information:

**Statement of ERISA rights**

A. As a participant in the Washington Natural Gas Company Group Insurance Program, you are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974. ERISA provides that all plan participants shall be entitled to:

1. Examine without charge at the Plan Administrator's office and at other specified locations (such as division and local offices) all plan documents, including insurance contracts and copies of all documents (such as annual reports and plan descriptions), filed by the Plan with the U.S. Department of Labor.

2. Obtain copies of all plan documents and other plan information upon written request to the Plan Administrator. The Administrator may make a reasonable charge for the copies.

3. Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary financial report.

B. In addition to creating rights for plan participants, ERISA imposes obligations upon the persons who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries," have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries.

C. No one may fire you or otherwise discriminate against you to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

D. If your claim for a welfare benefit is denied, in whole or in part, you must be provided with a written explanation of the reason for the denial. You have the right to a review and reconsideration of your claim by the Plan Administrator.

E. Under ERISA, there are steps you may take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

F. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state

14

*Discrimination for being over weight?*

or federal court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees; for example, if it finds your claim is frivolous.

G. If you have any questions about this statement or your rights under ERISA, you should contact the Plan Administrator or the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

15

# I N T E R O F F I C E   M E M O R A N D U M

Date:      02-Aug-1995 01:56pm PST
From:      Lisa Neal
           NEAL.LISA@A1@L909V1
Dept:      Group Sales, Seattle
Tel No:    (206)292-0050

TO:  Paul McTague

( MCTAGUE.PAUL@A1@L961V1 )

Subject: RE: Washington Natural Gas

Paul,

As far as I can tell, in October 1992, the client started printing their own booklets with our financial assistance. But our contracts prevail when there are differences.  Our contracts have only been printed once in 1991, then there were subsequent endorsements.  That may be why you have two versions of the booklet.  The Hartford Booklet-cert is comprised of:

BC-204853(GLT)

Endorsement A-  Executives get 5 year own occ/any occ. and 75% benefit if other income is received.

Endorsement #1-  Changed the Pre-Ex. to 6/12 months instead of 180/365 days.

Endorsement #2-  Offset for retirement benefits, instead of terminating benefits.

All of these Endorsements were effective back to 10/1/91.

I hope this helps!

Lisa

# Exhibit 3: Letter from Dr. Thomas F. O'Meara, January 19, 1993



**Olympia Multi-specialty Clinic**

406-A Black Hills Lane SW.
Olympia, Washington 98502
(206) 754-1727 FAX (206) 754-1713

January 19, 1993

Chronic Fatigue Clinic
Harborview Medical Center
ATTN: Sandy Oung – 2A60
325 9th Avenue
Seattle, WA  98104

RE: MAY, Patricia

Dear Sandy:

I am writing with respect to Patricia May to fill in some of her past gastrointestinal history. I first saw Pat in 1990 at a time when her chronic GI symptoms took a turn. Namely, she developed bloody diarrhea. She had undergone a flexible sigmoidoscopy and barium enema in 1987, I assume for similar symptoms. The picture in 1990 on colonoscopy was that of ulcerative colitis, however cultures returned positive for salmonella. She was treated appropriately and subsequent colonoscopy, again in light of her ongoing bowel complaints, was entirely normal. Small–bowel follow–through showed no evidence of Crohn's disease. At that point it was presumed that she had irritable bowel syndrome with superimposed infectious colitis. Because of ongoing pain localized to the right lower quadrant, the patient underwent laparoscopy in mid 1990 and extensive adhesive disease of the right lower quadrant was documented. The patient was taken to surgery by Dr. Steve Norton in December of that year demonstrating multiple adhesions in the area of the cecum. Adhesional lyses and appendectomy were performed.

The patient apparently did quite well after that because I had not seen her until October of 1992 when her symptoms were returning. I recommended dietary measures to include the use of Beano. I recommended Hemoccult cards. Because of the recurrence of rectal bleeding amidst her symptoms and the patient's concern over accurate diagnosis, we agreed to perform colonoscopy.

If I can be of any further service, please do not hesitate to contact me.

Sincerely,

Thomas F. O'Meara, M.D.
F.A.C.P.,F.A.C.G.
OMC,Gastroenterology/Hepatology

TFO/ksc :EMT

---

**CARDIOLOGY**
Philip W. Berger, D.O.
Phillip E. Jones, M.D.
W. Theodore Steudel, M.D.

**GASTROENTEROLOGY**
Marshall E. McCabe III, M.D.
Thomas F. O'Meara, M.D.
Richard S. Elloway, M.D.

**GENERAL SURGERY**
David M. Deitz, M.D.
**ORTHOPEDIC SURGERY**
Patrick J. Halpin, M.D.
Stephen W. Snow, M.D.

**PULMONARY / ALLERGY**
J. Waylon Black, M.D.

**VASCULAR SURGERY**
David M. Deitz, M.D.

# Exhibit 4: Medical History Timeline

1. MAY - MEDICAL HISTORY TIMELINE

Medical Reports

2. 1990 (According to January 19, 1993 Letter from Dr. Thomas F. O'Meara)
   a. In 1990, was the first time that it was presumed Patricia May had IBS.
   b. She had bloody diarrhea, tested positive for Salmonella.
   c. Later that year, in December, Dr. Steve Norton performed surgery, and found multiple adhesions in the area of the cecum.
3. January 18, 1990 Dr. O'Meara report
   a. Explosive diarrhea
   b. He suspect IBS
4. January 19, 1990 Dr. O'Meara Operation report
   a. Colonoscopy
   b. Chronic diarrhea, recently bloody.
5. March 5, 1990 Dr. O'Meara, Operation Report, Colonoscopy
   a. Probably irritable bowel syndrome.
   b. No evidence of IBD
   c. Chronic right lower quadrant pain.
   d. Recent Salmonella
6. March 5, 1990, Letter from Dr. O'Meara to Dr. Richard Faiola
   a. Explained the medication used to clear up Salmonella.
   b. Colonoscopy normal now.
   c. Patty "plagued with lower abdominal pain"
7. March 6, 1990 Dr. O'Meara
   a. States that she has advanced IBS.
8. August 17, 1990 Dr. O'Meara
   a. Worsening IBS
   b. Abdominal pain, cramping, diarrhea, and vomiting.
9. December 3, 1990, Dr. Andriacchi, Laparoscopy report
   a. Appendix had a veil of adhesions on it.
   b. Filmy adhesions in the small bowel area.
10. December 4, 1990, Dr. O'Meara, Telephone Conversation
    a. Talked with Dr. Andriacchi, no evidence of appendicitis.
11. December 10, 1990, Dr. O'Meara, History and Physical Report
    a. Recurrent diarrhea with serious discharge
    b. Possibly Irritable Bowel Syndrome
    c. Chronic right lower quadrant pain
12. December 13, 1990, Procedure Report, Colonoscopy
    a. History of Salmonella – culture came back positive
    b. Negative for Inflammatory Bowel Disease.
    c. Patty does have mucopurulent discharge, intermittent bleeding and diarrhea.
13. December 13, 1990, Pathology report, biopsy of colon
14. December 13, 1990, Radiologist report, colon
15. December 13, 1990, Dr. O'Meara, Notes
    a. Referred Patty over to Dr. Norton.
    b. IBS manifested by intermittent diarrhea.
    c. Persistent pain
    d. Wants to look at other areas of adhesion.

- e. Flares in pain
- f. When diarrhea occurs on the job it is difficult for her to find a restroom

16. December 20, 1990, Dr. Norton report
    - a. Patty referred by Dr. O'Meara.
    - b. Had Salmonella a year ago, and colon report confirms it is normal now.
    - c. Intermittent lower quadrant pain.
    - d. Possible recurrent episode of chronic appendicitis

17. December 26, 1990, Operative Report, appendectomy

18. December 27, 1990, Pathology report, appendix, appendectomy

19. January 8, 1991, Post-Appendectomy clinic note, Dr. Norton

20. November, 1991 (Dr. Daryl Austin, April 25, 1998 letter)
    - a. Affirmed that Plaintiff was diagnosed with chronic fatigue syndrome in November of 1991 by Dr. Tom Cooke in Chehalis, Washington.

21. November 6, 1991, Olympia Medical Laboratory
    - a. Testing for **Epstein-Barr Virus**

22. May 13, 1992, Attending Physician's Statement of Disability, Dr. Cooke
    - a. Diagnosis – Chronic Fatigue Syndrome.
    - b. Subjective symptoms = fatigue
    - c. Objective symptoms = abnormal lab results, fever

23. May 22, 1992, Disability Report, filled out by Patty
    - a. Disability condition = CFS
    - b. Changed conditions at work: wasn't able to finish shift, very tired, resting all the time, can't stay awake longer than 3-4 hours.
    - c. Unsafe to drive vehicle
    - d. Seeing Dr. Cooke for depression, spastic colon, no energy.
    - e. Also went to Harborview Hospital – Chronic Fatigue Clinic.
    - f. Kids do 90% of house work, Patty may cook one meal a week.
    - g. Work history: '73-'82 = Housewife, '82 = food processing, '82-'92 = meter reader.
    - h. Description of job duties, detailed.

24. June 5, 1992, Chronic Fatigue Clinic notes
    - a. Salmonella infection in past, spastic colon, tender breasts, sharp pain in groin, sleep disturbances, poor concentration, swollen joints on ankles and feet, some good days/some bad days.
    - b. Physical exam report

25. June 12, 1992, Attending Physician's statement of Continued Disability, Dr. Tomas Cooke
    - a. Diagnosis = Chronic Fatigue syndrome

26. July 6, 1992, Chronic Fatigue Clinic notes
    - a. Seen for CSF, insomnia, severe IBS, depression. (duration of each discussion)
    - b. Discussion of treatment options

27. July 9, 1992, C-DIS Report of DSM-III-R Diagnosis
    - a. Positive Diagnosis for Major Depressive Episode!!

28. July 14, 1992 – March 11, 1991, Dr. Cooke Office Notes
    - a. Generalized tenderness
    - b. Irritable bowel, Depression, Abdominal pain, nausea, vomiting, acute gastroenteritis. Cramping
    - c. Sees **Dr. O'Meara, gastroenterologist, regarding IBS.**
    - d. Fatigue, severe headaches
    - e. Ankle swelling, chronic fatigue, difficulty sleeping, bladder infection
    - f. Skin sores
    - g. Increased fatigue and vomiting, generally not doing well

    h.   She needs rest and a break from work.

    i.   Given disability for at least a month.

    j.   Very little tolerance for most activity.

29. July 17, 1992 Dept. of Health and Human Services SS Admin Letter

    a.   Denial of Disability benefits.

    b.   Reason: Condition is expected to improve.

30. July 21, 1992 Interoffice Memo, The Hartford

    a.   Confirming that Mrs. May was first diagnosed in November of 1991 with Chronic Fatigue Syndrome.

    b.   Confirming she began disability on March 9, 1992.

    c.   Confirming that she is seeing a specialist for her Chronic Fatigue Syndrome.

    d.   Confirming she has a spastic colon.

    e.   Fatigue problem is severe enough that she can't do her own shopping or heavy lifting, not much significant walking.

31. August 1, 1992, Letter from Dr. Cooke to The Hartford

    a.   Unable to return to work because of CFS.

    b.   Patty is receiving B-12 injections and is on Prozac. Still unable to work.

    c.   Laboratory testing as well as Chronic Fatigue Clinic at Harborview Medical Center have both confirmed her CFS diagnosis.

32. September 4, 1992, Chronic Fatigue Clinic notes

    a.   Fatigue better because of B-12 injections.

    b.   Insomnia better because of medication

    c.   IBS – Patty is seeing a Gastroenterologist.

    d.   Depression – Patty is seeing a counselor

33. November 3, 1992 Dr. Thomas Cooke, letter

    a.   Diagnosed with Chronic fatigue syndrome with laboratory testing. → confirmed by University of Washington, Harborview Medical Center, Chronic Fatigue Clinic.

    b.   Cannot work a full day.

34. November 6, 1992 Dr. O'Meara, Gastroenterology Note

    a.   Recently diagnosed chronic fatigue syndrome

    b.   IBS

    c.   Prior history of Salmonellosis

35. November 13, 1992, Chronic Fatigue clinic notes

    a.   Fatigue – in bed 5 days out of 7, and before was in bed 7 out of 7 days.

    b.   IBS and spastic colon, sees Gastroenterologist. Has it 5 to 7 days a week.

    c.   Depression, goes to a counselor

36. November 24, 1992 Dr. Cooke Initial Evaluation

    a.   Acknowledges that Harborview Medical Center provided the diagnosis for May's chronic fatigue syndrome.

37. January 15, 1993, Chronic Fatigue Clinic notes

    a.   Fatigue worse. Contracted a cold. Feeling lightheaded while talking or walking. More depressed, no energy.

    b.   Too sick to go see a physical therapist

38. January 26, 1993 Colonoscopy Report

    a.   Blood in stool and diarrhea.

    b.   No evidence of IBD

    c.   Weight = 137 lbs.

39. January 26, 1993, Colonoscopy, Pathology Report

40. January 27, 1993, Discharge Summary, Chehalis Physical Therapy.
    a. Diagnosis = CFS
    b. Too fatigued to come to sessions.
41. March 8, 1993, Chehalis Physical Therapy, Progress Report
    a. Beginning a slow program of stretching and strengthening.
    b. Use extreme caution to avoid fatigue and pain.
42. March 27, 1993 Dr. Jesse Fann, Report
    a. Confirms diagnosis of Chronic fatigue syndrome. Notes that she displays many physical symptoms consistent with this syndrome.
    b. Anxiety disorder
    c. Estimated that with improving physical ability, will be able to return to work in the near future. But needs to be continuously evaluated. Chronic fatigue syndrome prevents her from working at this time.
43. April 12, 1993, Chronic Fatigue Clinic notes
    a. Medications are working well. IBS much more controlled, sleeping better, less depressed.
44. April 16, 1993 Dept. of Health and Human Services SS Admin Letter
    a. Denial of Disability benefits.
    b. Reason: They were lacking Dr. Cooke's reports.
45. June 16, 1993 – September 19, 1991, Medical office notes and phone messages
    a. 3/1/93 – Calling to get physical therapy recommendation again
    b. 3/8/93 – "Still isn't able to be active eon a consistent basis. Has some days a little better than other days, some not able to be active at all and if she is out for more than anything more than 3-4 hours, she usually starts getting shaky and quite weak." Starting Physical Therapy.
    c. 12/21/92 – Chronic fatigue. "Increasing agitation and tremors and is unable to really hold things anymore and is really quite uncomfortable, difficulty with driving." A lot of bowel gas and foul breath.
    d. 10/1/92 – Increased pain in lower abdomen area. Ongoing problem with chronic fatigue.
    e. 10/6/92 – colon pain, diarrhea
    f. 9/29/92 – increased colon pain.
    g. 7/23/92 – sore throat secondary to **Epstein-Bar**/chronic fatigue syndrome.
    h. 6/11/92 – fatigue
    i. 6/30/92 – Diarrhea for the past two weeks
    j. 5/14/92 – chronic fatigue, vitamins seem to be helping. Continuing to rest and slowly increase activity to walking.
    k. 4/21/92 – chronic fatigue, still quite tired and has very little tolerance for most activity. Even short walks produce a lot of fatigue, has headaches and arthralgia.
    l. 3/9/92 – Doing worse, increased fatigue. Needs a rest and break from work.
    m. 1/21/92 – severe headache, nausea, vomiting,
    n. 2/19/92 – increased fatigue, vomiting, not doing well.
    o. 1/15/92 – Sores
    p. 1/20/92 – increased bowels, tenderness
    q. 12/17/91 – ankle swelling. Chronic fatigue.
    r. 12/26/91 – Bladder infection.
    s. 11/6/91 – fatigue, headache
    t. 9/20/91 – vomiting and diarrhea. Cramping in lower abdomen.
    u. 9/19/13 – Abdominal pain, nausea, vomiting
    v. 3/11/91 – Depression. Irritable bowel.
46. July 9, 1993, Chronic Fatigue Clinic notes

    a.   Fatigue. Flu symptoms, associated with fibromyalgia. Swollen gland. Sore throat.

    b.   Insomnia. Taking naps.

    c.   IBS doing better on meds.

47. July 22, 1993, Lab Report, Harborview Medical Center
   a. Chronic Fatigue Panel done
   b. Results: "Evidence of past infection with Coxsackie B viruses, types 4 and 5."

48. August 11, 1993 – May 24, 1993, Office notes & phone messages
   a. Patty in for chronic fatigue.
   b. Being seen at the Harborview Chronic Fatigue Clinic.
   c. Severe diarrhea.

49. August 11, 1993, Attending Physician's statement of Continued Disability, Dr. Dedra Buchwald
   a. Diagnosis = Chronic Fatigue syndrome

50. September 24, 1993 & October 18, 1993, Chronic Fatigue Clinic notes
   a. Specifically September 24, 1993,
      i.   Pain worse for about a month
      ii.   Depression better, Fatigue is stable
      iii.   Treated with Prozac
      iv.   Sleeping 10-12 hours per week
      v.   Had IBS
   b. Fatigue has gotten worse. Associated with nausea and earache.
   c. Nausea worsens when Mrs. May tries to push herself.
   d. Insomnia stable
   e. Light headedness
   f. Oct. 18 – Fatigue a little better with meds.

51. October 28, 1993 Dr. Thomas O'Meara
   a. Impression:
      i.   *Very complex* case of idiopathic diarrhea (bloody)
      ii.   Chronic Fatigue Syndrome
      iii.   Weight gain
      iv.   Chronic nausea

52. November 1, 1993, Chronic Fatigue Clinic notes
   a. Diarrhea
   b. Vomiting.
   c. Fatigue worse, fatigue related to diarrhea

53. November 3, 1993, Letter from Dr. Cooke to The Hartford
   a. Informing them Patty has been "diagnosed with chronic fatigue, both by our office with laboratory testing as well as consultation and confirmation at University of Washington, Harborview Medical Center, Chronic Fatigue Clinic."
   b. Unable to work a full day.

54. February 25, 1994 Chronic Fatigue Clinic notes
   a. IBS
   b. Depression
   c. Problems with sleep
   d. Fatigue

55. April 4, 1994, Chronic Fatigue Clinic notes
   a. Fatigued, still sleep 10-12 hours per night, and fatigued while doing some activities
   b. IBS better with medication.

56. April 5, 1994, Claim Questionnaire

       a.   Significant physical limitations = no energy, tired all the time.

       b.   Hobbies prior to disability = horses (now daughter takes care of them)

57. April 12, 1994, Attending Physician's statement of Continued Disability, Dr. Dedra Buchwald
   a. Diagnosis = Fibromyalgia, Chronic Fatigue syndrome, IBS, Depression
   b. Treated with anti-depressants (Prozac)

58. January 5, 1996, Statement from Patty…. *See,* Admin binder
   a. Not anticipating returning to work unless condition "goes away".

59. March 15, 1996, Attending Physician's statement of Disability, Dr. Thomas Cooke
   a. Diagnosis = Fibromyalgia, Chronic Fatigue syndrome, Colitus

60. January 9, 1997, Attending Physician's statement of continued Disability, Dr. Thomas Cooke
   a. Primary Diagnosis = Fibromyalgia, Chronic Fatigue syndrome

61. August 22, 1997, Providence Outpatient Admission and Charge Report
   a. Complaint: facial lesions

62. August 22, 1997, Providence Operative Note, Dr. Holland
   a. Expanding facial cysts, discharging foul smelling, pasty material.
   b. Cysts removed.
   c. Related notes/correspondence between Dr. Holland and Dr. Cooke

63. November 18, 1997, Outpatient Report, Dr. Thomas Arntson
   a. Resolving low back pain.
   b. Used a GE Pace Plus computerized tomopgraphic unit.

64. Jan. 17, 1998, Inpatient record, Dr. Cooke.
   a. Patty came in for Gastroenteritis/viral issues

65. Jan. 18, 1998, Dr. Thomas Cooke, History and Physical exam
   a. Nausea and vomiting, persistent viral problem, as well as some diarrhea.
   b. Does have fibromyalgia.

66. Jan. 22, 1998, Patient Status Report, Dr. Cooke
   a. Patty has tried Electric stimulation, and found it to be somewhat helpful.

67. April 12, 1998 Dr. Thomas Cooke, letter
   a. Ongoing back pain
   b. Colitis and bowel problems – causes problems and interference, but *not* a complete disability.
      i. Multiple colonoscopies performed by Dr. O'Meara, a gastroenterologist.
   c. Increased fatigue over the last several years, tests in line with chronic fatigue syndrome.
   d. Fibromyalgia – worsened in pain in musculoskeletal system corresponding to fibromyalgia. Reaffirms diagnosis
   e. Not capable of working: chronic fatigue, fibromyalgia.

68. April 25, 1998 Medical Report, Dr. Daryl Austin
   a. Diagnosed chronic fatigue syndrome.
   b. Diagnosed fibromyalgia.
      i. Responded to multiple trigger points consistent with fibromyalgia.
   c. Low back pain
   d. Possible degenerative joint disease of the right hip.
   e. History of spastic colon. Testing Negative for IBS. 2-3 stools on good days, and stools every 20 min on bad days.

69. May 10, 1999, Dr. Thomas O'Meara, Medical Report
   a. Impression: Diarrhea, Fibromyalgia with concomitant IBS
   b. Recommendations: a Flexible sigmoidoscopy seems appropriate, perhaps testing for celiac disease as well.

    c.   Patty states she was issues with chronic fatigue, night sweats, easy bruisability, fibromyalgia, shortness of breath with pain, occasional rectal bleeding.

    d.   Review of Systems: mild sleep disorder and fibromyalgia with chronic fatigue.

70. June 1, 1999, Flexible Sigmoidoscopy Report, Dr. O'Meara
    a.   Colon was normal.

71. June 1, 1999, Pathology Report, Dr. Whitten
    a.   Colon Biopsy
    b.   No abnormalities

72. September 17, 1999, Attending Physician's statement of continued Disability, Dr. Thomas Cooke
    a.   Primary Diagnosis = Fibromyalgia, Depression
    b.   Secondary Diagnosis = Colitis (can't read second word)

73. September 22, 1999, Claimant's Disability Update
    a.   Significant limitations: Pain, Spastic colon, Depression, CFS, Fibromyalgia

74. February 16, 2000, Mammography Report
    a.   Negative

75. February 16, 2000, Ultrasound Report
    a.   Normal

76. February 23, 2000, Office Memo, Dr. Cooke
    a.   Mammogram normal
    b.   Might need biopsy for ultrasound results.

77. November 21, 2000, Claimant Questionnaire
    a.   Current medical condition = Pain, spastic colon, CFS, stiffness, hot flashes, weakness, shaky.
    b.   Daily activities = get dressed, help husband with laundry a little, watch a lot of TV, rest
    c.   Hobbies prior to disability = work, kids' school activities, running, friends
    d.   Needs help with daily chores, lifting, and anything involving physical strain
    e.   Seeing Dr. Wu and Dr. Halpin

78. July 16, 2004 - June 15, 2007 → Several more reports of the symptoms moving forward. See reports for details.
    a.   Referencing IBS, Fibromyalgia, depression, insomnia issues, urinary infections, fatigue

79. April 25, 2001, Dr. Cooke, Referral for Physical Therapy
    a.   Referred to physical therapy due to Fibromyalgia and Chronic Fatigue.

80. August 30, 2001, Attending Physician's statement of continued Disability, Dr. Thomas Cooke**
    a.   Primary Diagnosis = Fibromyalgia, Depression
    b.   Subjective symptoms of fatigue and irritability.
    c.   Trigger points in back, knees, and shoulders.

81. October 30, 2001, Claimant Questionnaire
    a.   Changes in condition = worsening Depression, eye sight worsening, hot flashes, weight gain
    b.   Physical activities during the day = going to the councilor, not feeling safe driving around.
    c.   Cannot bath by herself, can't get out of the bathtub. Also needs help with bladder control and hygiene because of spastic colon.
    d.   Activities participated in before disability = walking, vising friends, playing cards with friends, custom car shows, yard work, riding horses.
    e.   Seeing Dr. Tom Cooke at Centralia, WA; Nickie Wook, MA social services; Dr. Yaman DDS

82. April 24, 2002 Office Note, Dr. Cooke
    a.   Came in with abdominal pain.
    b.   Pelvic exam reported tenderness on right side of abdomen, with no mass.

83. May 14, 2002, Office Memo, Dr. Cooke
    a.   Pap results normal

84. May 22, 2002, Mammography Report, Dr. Cooke
    a. Negative
85. May 30 , 2002, Office Note, Dr. Cooke
    a. Mammogram was normal
86. 2003 -2002, Dr. Cooke Office Notes
    a. Paps, medication refill, sick, ongoing problems associated with pain, weight, depression, chronic pain, fibromyalgia, fatigue symptoms, concentration, sleeping, abdominal pain
    b. Ongoing difficulty with chronic fatigue and depression, Possible alternative treatments with Dr. Ellis
87. January 7,  2003, Claimant Questionnaire
    a. Physical activities during the day = going to the councilor, not feeling safe driving around.
    b. Cannot bath by herself, can't get out of the bathtub. Has to take a sponge bath.
    c. Having too much trouble filling out the paper work, doesn't state the activities she enjoyed before becoming disabled.
    d. Seeing Dr. Tom Cooke at Centralia, WA.
88. January 7, 2003, Physical Capacities Evaluation Form, Dr. Thomas Cooke
    a. Mostly left blank.
    b. Stated Patty could do movements "occasionally" and her restrictions are permanent.
    c. She has reached maximum medical improvement, and can never return to work at regular occupation.
89. January 7, 2003, Attending Physician's statement of continued Disability, Dr. Thomas Cooke, *unsigned*
    a. Primary Diagnosis = Fibromyalgia, Chronic Fatigue Syndrome.
    b. Back, arm and leg pain.
    c. Can only do activities secondary to her fatigue.
90. March 12, 2003, Cedar Crest Whole Health Medical Center, Lab results for Allergy Testing.
    a. Patty needs to avoid Gluten, Rye, Blueberry, Wheat, Peanuts, Sesame, Shrimp.
91. March 27, 2003, Cedar Crest Whole Health Medical Center, Lab results for Allergy Testing.
    a. Lower than optimal levels of Lactobacilli, where assists with gastrointestinal functioning.
92. April 8, 2003, Cedar Crest Whole Health Medical Center, lab results review, Dr. David Ellis
93. April 10, 2003, Cedar Crest Whole Health Medical Center, Lab results for Allergy Testing.
94. April 28, 2003, Cedar Crest Whole Health Medical Center, Lab results for Allergy Testing.
95. May 6, 2003, Cedar Crest Whole Health Medical Center, treatment plan
96. June 9, 2003, Cedar Crest Whole Health Medical Center, treatment plan
97. September 06, 2003, Dr. Cooke, Lab Report
    a. Positive results suggesting **Epstein Barr Virus** infection at some undermined time in the past.
98. September 08, 2003, Dr. Cooke, Notes
    a. "Epstein Barr Virus, 6.01, High!"
99. September 25, 2003, Pelvic Ultrasound report, Dr. Lovin, Providence Centralia Hospital
    a. Plevic pain, increased bleeding. Cyst on right ovary.
100. September 29, 2003, Dr. Cooke, Notes
    a. Cyst in ovary
101. December 17, 2003, Cedar Crest Whole Health Medical Center, Lab results for Allergy Testing.
102. February 2, 2004, Claimant Questionnaire
    a. CFS, Fibromyalgia, Spastic Colon, Depression, pain, being tired
    b. Physical activities during the day = Sometimes make beds, walk out to the horses, sometimes check mail, husband helps feed the horses and does the housework.
    c. Cannot bath by herself, can't get out of the bathtub.
    d. Can't keep up with paying bills, husband has to do it.

    e.   Activities prior to disability = Horseback riding, car club, raising family, visiting friends, going to church.

    f.   Seeing Dr. Ellis in Winlock, WA and Dr. Tom Cooke at Centralia, WA.

103. February 3, 2004, Attending Physician's statement of continued Disability, Dr. Thomas Cooke

    a.   Primary Diagnosis = Fibromyalgia

    b.   Secondary Diagnosis = Depression

104. March 16, 2004, Physical Capacities Evaluation Form, Dr. Thomas Cooke

    a.   Mrs. May is only able to: Sit for 5 hours, Stand for 2 hours, and Walk for 2 hours *total throughout the day.*

    b.   Restrictions are *not* likely to change.

105. July, 16, 2004, Office visit, Dr. Bryan Stamm

    a.   UTI

    b.   Fibromyalgia, chronic fatigue, and spastic colon

106. January 25, 2005, Office visit, Dr. Bryan Stamm

    a.   UTI, discomfort

    b.   Frequent fatigue

    c.   Frequent diarrhea

    d.   Nocturnal leg cramps

    e.   Depression

107. March 8, 2005 – November 29, 1999, Office Notes, Dr. Cooke (lots of cancelled appointments!)

    a.   3/8/05 – chronic disability as a result of fibromyalgia and depression. Can only perform limited activities, if at all.

    b.   2/3/04 – chronic pain secondary to fibromyalgia, depression problems. She had some alternative treatments with Dr. David Ellis, had testing done, and it showed toxicity in lead.

    c.   9/4/03 – Ongoing problems associated with fatigue, has some pelvic pain with bleeding problems

    d.   3/4/03 – ongoing problems associated with pain, weight, depression.

    e.   1/7/03 – chronic pain, fatigue symptoms. Gaining weight. Depression.

    f.   11/13/02 – Flu shot, talked about alternative treatments

    g.   8/7/02 – Chronic pain and problem associated with depression.

    h.   7/18/02 – Increasing problem with fatigue, concentration, sleeping. Worsening depression.

    i.   4/24/02 – abdominal pain. Fibromyalgia.

    j.   1/26/02 – chronic pain secondary to fibromyalgia

    k.   1/2/02 - Ongoing pain, fibromyalgia, fatigue symptoms, step-mom has cancer and Patty is having trouble coping, discussing stress techniques

    l.   8/7/01 - Rosacea, depression

    m.   8/30/01 - on-going problems with neck and back pain. Scheduled appointment with Dr. Dennis, a Psychiatrist.

    n.   6/12/01 - Referral to physical therapy, rash on abdomen

    o.   4/5/01 - Cramping acute conjunctivitis,

    p.   2/13/01 - Rash on face, ongoing problems with chronic pain, fibromyalgia, depression, CFS

    q.   1/16/01 - Continuing problems with eyes – infection of blood vessels, weight issues

    r.   11/21/00 - On-going difficulty with fibromyalgia.

    s.   9/7/00 - Chronic Pain secondary to Fibromyalgia. Difficulty sleeping,

    t.   5/23/00 - mood swings, hot flashes, fibromyalgia, neck and back pain.

    u.   4/4/00 - Possible herpes on lips. Back pain and fibromyalgia.

    v.   2/29/00 – increasing cramps, chronic fatigue and depression symptoms.

    w.   2/8/00 - Chest pain related to fibromyalgia

    x.   1/18/00 - problems with fibromyalgia and chronic pain.

     y. 1/10/00 - Ear pain, sinusitis, chronic elbow pain

     z. 11/29/99 - Tenderness along the neck and back. Difficulty with concentration, lethargy

     aa. 9/16/99 – chronic fatigue, fibromyalgia. Problems with right elbow. Tenderness. Depression.

108. March 8, 2005, Attending Physician's statement of continued Disability, Dr. Thomas Cooke

     a. Primary Diagnosis = Fibromyalgia

     b. Secondary Diagnosis = Depression

109. March 8, 2005, Physical Capacities Evaluation Form, Dr. Thomas Cooke

     a. Mrs. May is only able to: Sit for 1 hour, Stand for 1 hour, and Walk for 1 hour *total throughout the day.*

     b. Restrictions are *not* likely to change.

110. March 8, 2005, Claimant Questionnaire

     a. CFS, Fibromyalgia, Spastic Colon, Depression

     b. Physical activities during the day = Some cooking, house cleaning – she requires assistance from husband with these. Feeds the horses sometimes.

     c. Needs assistance with personal hygiene.

     d. Activities prior to disability = Horseback riding, running, work full time, raised 4 kids, visiting friends, going to church.

     e. Seeing Dr. Ellis in Winlock, WA and Dr. Tom Cooke at Centralia, WA.

111. November 14, 2005, Office visit, Dr. Bryan Stamm

     a. Fibromyalgia, nocturnal leg cramps

112. January 3, 2006, Office visit, Dr. Bryan Stamm

     a. 12 lbs weight loss since Nov. 2005.

     b. Insomnia

113. March 6, 2006, Office visit, Dr. Bryan Stamm

     a. Depression

     b. Overactive bladder

     c. IBS

     d. Insomnia

114. March 30, 2006, Office visit, Dr. Bryan Stamm

     a. Overactive bladder and urinary incontinence.

     b. Insomnia

     c. IBS

     d. Depression

115. April 11, 2006, Lab report, Inland Imaging

     a. Mammogram normal

116. April 13, 2006, Inland Imaging

     a. Mammogram was normal

117. May 3, 2006, Office Visit, Cori Lopez, DO

     a. Eye redness/irritation

118. May 23, 2006, Claimant Questionnaire

     a. CFS, Fibromyalgia, Spastic Colon, Depression

     b. Physical activities during the day = Some cooking, house cleaning – she requires assistance with these.

     c. Needs assistance with personal hygiene.

     d. Activities prior to disability = Horseback riding, yard work, running, work full time, volunteer work

     e. Seeing Dr. Tom Cook in Centralia and Dr. Stamm at Benewah.

119. June 22, 2006 Dr. Cooke, Medical Clinic Sick Visit

  a. Tenderness in back

  b. Pain in hands

  c. Fibromyalgia

  d. Chronic pain

  e. Fatigue

  f. Sleep Disturbances

120. June 23, 2006, Attending Physician's statement of continued Disability, Dr. Thomas Cooke

  a. Primary Diagnosis = Fibromyalgia

121. June 23, 2006, Physical Capacities Evaluation Form, Dr. Thomas Cooke

  a. Mrs. May is only able to: Sit for 2 hour, Stand for 30 minutes, and Walk for 30 minutes *at a time*.

  b. Mrs. May is only able to: Sit for 6 hours, Stand for 2 hours, and Walk for 1 hour *total throughout the day*.

122. August 4, 2006, Letter from Dr. Stamm

  a. Dr. said May was seen on 05/03/06 for sub conjunctional hemorrhage.

  b. Depression discussed, well-treated with medication on 3/30/06 visit.

  c. He also discussed other times he had seen Patty recently: 3/6/06 for refill on Wellbutin prescription; 1/3/06 for weightless, insomnia, and dermatitis; 11/14/05 for dermatitis, obesity and depression; 1/25/05 for a physical and pap smear; 7/16/04 for UTI

  d. He says he has ***no records regarding any problems involving a long term disability, she may be seeing another provider for this.*** ← YIKES!!!! Not good.

123. September 21, 2006, Office visit, Dr. Bryan Stamm

  a. Worsening fibromyalgia symptoms

  b. Pain in her right shoulder and lower back.

124. March, 16, 2007 Physical Capacities Evaluation form, Dr. Cooke

  a. Can sit for 5 hours a day, stand for 2 hours a day, walk for 2 hours a day, driving 2 hours a day, frequently able to lift 10 lbs, occasionally up to 50lbs. push/pull 10 lbs frequently, and occasionally up to 50 lbs. Occasionally capable of reaching, handling, fingering, and feeling.

125. April 6, 2007, Medical Report, Dr. Bryan Stamm

  a. Depression

  b. Significant IBS symptoms.

  c. Aches and pains bothering her.

  d. No improvement on pain

126. May 22, 2007, Medical Report, Dr. Kim Cunningham-Hartwig

  a. Loose stool, occasionally bloody (4-5 stools per day)

127. June 15, 2007, Medical Report, Dr. Bryan Stamm

  a. Recurrent diarrhea

128. June 15, 2007, Medical Report, Dr. Bryan Stamm

  a. Persistent Diarrhea

129. June 15, 2007, Attending Physician's statement of continued Disability, Dr. Bryon Stamm

  a. Primary Diagnosis = Chronic fatigue syndrome

  b. Secondary Diagnosis = IBS, Fibromyalgia, Depression

  c. Capable of standing up to 30 min (then fatigue and pain), walking 100 yards (then leg pain), sitting for 1 hour before needing to stretch.

  d. Capable of carrying groceries between 20-25lbs.

  e. Frequent bathroom breaks due to IBS.

  f. Shoulder pain if lifting overhead

  g. Shoulder pain if pulling laundry from washer

130. June 15, 2007, Physical Capacities Evaluation Form, Dr. Bryon Stamm

     a.  Mrs. May is only able to: Sit for 1 hour, Stand for 30 minutes, and Walk for 10 minutes *at a time.*

     b.  Mrs. May is only able to: Sit for 3 hours, Stand for 3 hours, and Walk for 1 hour *total throughout the day.*

131. June 17, 2007, Dr. Stamm report for insurer
     a.  Does he mean the June 15, 2007, Attending Physician's Statement of Continued Disability? *If* he did, here are his responses:
         i.  She has CFS, fibromyalgia, and depression. Also states she has Irritable Bowel Syndrome.
         ii.  Slight difficulty in occupational functioning but generally was functioning well. We agree.

132. June 26, 2007, Claimant Questionnaire
     a.  CFS, Fibromyalgia, Spastic Colon, Depression
     b.  Physical activities during the day = waters some plants in the summer. Tries to walk for exercise. Some housework and cooking, feeds horses rarely in winter.
     c.  Needs assistance with personal hygiene.
     d.  Activities prior to disability = Horseback riding, yard work, car shows, raised kids, work full time
     e.  Seeing Dr. Stamm at Benewah.

133. September 6, 2007, Attending Physician's Statement, Dr. Stamm
     a.  Diagnosis: Depression, Fibromyalgia, Insomnia, Obesity, IBS
     b.  Subjective symptoms: Diarrhea.

134. September 12, 2007, Letter from Spokane Digestive Disease Center, Deaconess, to Patty
     a.  Polyp removed during colonoscopy. Non-cancerous.

135. September 25, 2007, Lab report, Dr. Stamm
     a.  Negative stool cultures

136. October 19, 2007, Medical Report, Dr. Bryan Stamm
     a.  Giardia, Diarrhea
     b.  Chronic Fatigue
     c.  Non-restorative sleep
     d.  Foot pain

137. December 3, 2007, Letter from Inland Imaging to Patty
     a.  Mammogram was normal.

138. December 5, 2007, Letter from Benewah Medical Center to Patty
     a.  Mammogram was normal.

139. February 29, 2008, Office visit, Bryan Stamm MD
     a.  Regular pap exam
     b.  Chronic fatigue/fibromyalgia. Has fatigue
     c.  Abdominal cramping.

140. May 1, 2008, Office Visit, Bryan Stamm, Benewah Medical Center
     a.  Follow up on foot pain
     b.  History of fibromyalgia

141. May 6, 2008, Office Visit, Bryan Stamm, Benewah Medical Center
     a.  Follow up on foot.

142. July 20, 2008, Claimant Questionnaire
     a.  Current medical issues – Spastic Colon, CFS, Fibromyalgia, Depression
     b.  Daily activities that she needs help with: vacuuming, folding clothes, dusting, getting dress, watering flowers.
     c.  Activities engaged in before medical issues: All thins she wanted: Raised 4 kids, horse riding, hot rod shows, working full time.

    d.    The Doctors she is seeing: Dr. Stamm, Dr. Hong, Dan Smith (physical therapy)

143. July 28, 2008, Medical Report, Dr. Bryan Stamm
    a.    Acknowledging Chronic Fatigue, Fibromyalgia, depression, IBS, overactive bladder, fatigue, rashes
    b.    Weight = 185lbs

144. July 28, 2008, Attending Physician's statement of continued Disability, Dr. Bryon Stamm
    a.    Primary Diagnosis = Chronic fatigue syndrome
    b.    Secondary Diagnosis = IBS, Fibromyalgia, Depression

145. October 24, 2008, Office Visit, Dr. Bryan Stamm, Benewah Medical Center
    a.    Abdominal discomfort and cramping
    b.    Fibromyalgia
    c.    Chronic fatigue syndrome
    d.    IBS, controlled with a LOT of Imodium, agreed
    e.    Rosacea, obesity, depression

146. April 2, 2009, Office Visit, Dr. James Mullen, Benewah Medical Center
    a.    Sinus – sinusitis

147. June 12, 2009, Office Visit, Dr. Elizabeth Topsky, Benewah Medical Center
    a.    UTI

148. June 22, 2009, Office Visit, Dr. Elizabeth Topsky, Benewah Medical Center
    a.    IBS, fecal dripping
    b.    UTI

149. July 10, 2009 Preventative Medicine, Dr. James Mullen
    a.    Physical Exam
    b.    Fatigue and night sweats from Chronic Fatigue Syndrome
    c.    Diarrhea
    d.    History of Fibromyalgia
    e.    Back pain, myalgias, neck stiffness

150. July 10, 2009, Attending Physician's Statement, Dr. Mullen
    a.    Diagnosis: Fibromyalgia, Insomnia, Obesity, Depression

151. July 30, 2009, Letter from Benewah to Patty
    a.    Pap test was normal.

152. August 3, 2009, Dr. Stamm
    a.    Depression well-treated
    b.    She is doing fine
    c.    No records regarding any problems involving a long-term disability.

153. August 21, 2009, Office Visit, Dr. James Mullen, Benewah Medical Center
    a.    Daily fatigue, worsening. Aggravated by joint pain and abdominal cramping.
    b.    Daily abdominal cramping, worsening, problem is daily

154. August 26, 2009, Nurse Visit, Dr. James Mullen, Benewah Medical Center
    a.    Urinary tract infection.

155. October 1, 2009, Claimant Questionnaire
    a.    CFS, Fibromyalgia, IBS, Depression
    b.    Physical activities during the day = waters some plants in the summer, sleeps and rests. Husband does housework and cooks.
    c.    Needs assistance with personal hygiene.
    d.    Activities prior to disability = Horseback riding, yard work, car shows, visited friends, work full time, went to church
    e.    Was seeing Dr. Stamm at Benewah but he left. Now she is seeing Dr. Mullen.

156. October 2, 2009, Attending Physician's statement of continued Disability, Dr. James Mullen
   a. Seen every 3 months. Agreed, Dr. Mullen says "quarterly visits"
   b. Primary Diagnosis = Chronic fatigue syndrome,
   c. Secondary Diagnosis = IBS, Fibromyalgia, Depression
   d. States that she had CFS, IRBS, and fibromyalgia. However, says "she also *reportedly* had depression" ← Why would he report this way, even though depression was listed in the same group of diagnosis as IBS and Fibromyalgia?
   e. Sitting up to (1 hour at a time) 3 hours a day (Dr. Chagnon says a total of 3 hours), stand up to (30 minutes at a time) 3 hours a day (Dr. Chagnon says a total of 3 hours), walk (10 minutes at a time) 1 hour a day (Dr. Chagnon says a total of 1 hour). Lift 10lbs frequently, lift up to 50lbs occasionally. Occasionally can reach waist level and below. No restrictions with fingering or handling.
   f. **Longstanding illness, prior to establishing care with that office.**
   g. Expected duration: Lifetime. Lifetime restrictions in terms of lifting capabilities and reaching.
   h. Patty would *not* be able to participate in vocational rehabilitation services.
   i. Wears reading glasses
157. October 2, 2009, Office Visit, Dr. James Mullen, Benewah Medical Center
   a. Depression
   b. UTI, Dysuria
   c. Chronic Problems:
      i. Fibromyalgia
      ii. Depressive Disorder
      iii. IBS
158. June 12, 2010, Richard Wells Report
   a. Seen for cough. Diagnosed with pneumonia.
   b. Treated with Clindamycin and DuoNeb
159. June 22, 2010, Office Visit, Dr. Cunningham Hartwig, Benewah Medical Center
   a. Depression, Obesity
   b. Moved Patty's mother into *their* home because she has progressing MS.
   c. "she has to be there for others and she did not eat because of abdominal pain." ← She does not eat because it will interfere with being there for others and cause abdominal pain. Her spastic colon prohibits regular food intake.
   d. Trouble sleeping
   e. Taking Wellbutrin and Paxil
160. August 7, 2010, Claimant Questionnaire, The Hartford
   a. Current medical conditions: CFS, IBS, Depression, Fibromyalgia.
   b. Physical activity: Taking it easy, some walking, husband does most housework and cooking
   c. Needs assistance devices to maintain hygiene and use the bathroom.
   d. Was recently being seen by Dr. Mullen at Benewah Medical Clinic, but he *retired.*
161. August 9, 2010, Office Visit, Dr. Cunningham Hartwig, Benewah Medical Center
   a. Fibromyalgia, Muscle pain
      i. Mrs. May wanted Dr. Hartwig to fill out disability paperwork, but Dr. didn't have time to do a physical test, so didn't fill out the paperwork.
   b. Depression
   c. Insomnia
   d. Anxiety
   e. Dr. Hartwig did not feel comfortable competing disability paperwork for claimant and gave her name of occupational therapist to evaluate her work capabilities. He did not feel comfortable

because he was "not able to assess the duration the patient is capable of seeding, standing or weight the patient may be able to life on a regular basis." "I do not feel that a 15 or 30 minute appointment is adequate to assess these functions."

162. August 12, 2010, Office Visit, Richard Wells, DO, Benewah Medical Center
   a. Cough
   b. Showing of pneumonia
   c. On anti-depressants
   d. No indications of functional limitations.
   e. Fatigue, ill appearing, moderate distress, overweight, night sweats, sore throat, wheezing, headache, chest tightness, Otalgia (ear pain), Pharyngitis (inflammation of throat)

163. August 13, 2010, Office Visit, Richard Wells, DO, Benewah Medical Center
   a. Pneumonia follow up

164. August 23, 2010, Office Visit, Richard Wells, DO, Benewah Medical Center
   a. Anxiety attack
   b. Problems with cough, feeling lightheaded, fatigued, and feeling shaky.

165. September 9, 2010, Office Visit, Richard Wells, DO, Benewah Medical Center
   a. Continue with current treatment regime for Fibromyalgia.
   b. Sleep disturbances
   c. Chronic Problems: Depression, IBS, Fibromyalgia, Obesity.

166. December 13, 2010, Office Visit, Susan Hildebrandt, NP, Benewah Medical Center
   a. First time seeing Hildebrandt,
   b. Anti-depressants not working well.
   c. Depression, worsening,
   d. Needs counseling
   e. Difficult to meet home, work, or social obligations,
   f. Chronic Diarrhea, tenderness
      i. With laboratory tests.
   g. Multiple symptoms of depression.
   h. Diagnosed with atypical depression (less symptoms than usually found for major depression. will see her mood improve if something positive happens)
   i. Taking Wellbutrin and Paxil
   j. Switched from Trazodone and started Amitriptyline.
   k. Told to increase exercise.

167. December 14, 2010, *Intake*, Benewah Medical Center, Chrystal Hodgson LMSW
   a. Initial appointment with this Social Worker
   b. Depression, daily, recurrent
   c. Chronic medical issues that limit her daily activities.
   d. Depressed more than normal, feeling sad, crying easily
   e. Changing sleep patterns, difficulty falling/staying asleep
   f. Has not been on pain medication for 7 years.
   g. Very impulsive, used to impulsively buy things,
   h. Family history of depression and suicide
   i. GAF (Global Assessment of Functioning) = 53 (moderate)
   j. Increased medical issues
   k. Commitments to caring of r parents – mother in long-term care facility, and father lives on property.
   l. Appropriate speech and intact memory.

168. December 21, 2010, Individual Therapy, Benewah Medical Center, Chrystal Hodgson

    a. Mrs. May has been struggling with on-going depression since 1984,
    b. Depression is worsening, major depressive episode symptoms
    c. Very impulsive.
    d. Fearful thoughts, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, panic attacks, poor concentration, indecisiveness, restlessness, sleep disturbance.
    e. Anxiety has worsened

169. January 7, 2011, Office Visit, Susan Hildebrandt, NP, Benewah Medical Center
    a. Depression, symptoms aggravated by IBS.
    b. Chronic and acute Diarrhea
        i. Increased stress could be related
    c. Anxious, fearful, diminished interest in pleasure, fatigue/loss of energy, feelings of guilt, worthlessness, restlessness, sluggishness.
    d. IBS relieved by exercise, medication and rest.
    e. Depression has improved with medication and counseling
    f. Negative lab work
    g. Possible lactose intolerance?
    h. Told to do yoga and relaxation techniques.
    i. Treated with Paxil and Wellbutrin.

170. January 12, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
    a. Started a new medication for Depression, Mrs. May reports it is helping.
    b. Stress level high

171. January 17 , 2011, Office Visit, Susan Hildebrandt, NP, Benewah Medical Center
    a. Fibromyalgia
        i. Pain is aggravated by bending, climbing/descending stairs, lifting, movement, pushing, sitting, walking and standing
        ii. Savella medication trial
    b. Burning and piercing pain
    c. Patricia wants to reduce anti-depressants

172. February 16, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
    a. Continued mood improvement, therapy helping
    b. Struggling with physical health, ill last month
    c. Appeared brighter and increased self-esteem,
    d. Chronic medical issues that limit her daily activities.

173. February 15, 2011 Office visit, Susan Hildebrandt NP, Benewah
    a. Not taking Paxil anymore, on Savella. Stopped Amitriptyline.
    b. On Bentyl, prescribed in emergency room, for chronic diarrhea.
    c. Depression
    d. Diarrhea, acute/chronic
    e. Complaining of Fibromyalgia, spastic colon, chronic fatigue syndrome

174. February 28, 2011, Lab Reports, Benewah Medical Center
    a. Dr. Mullen
    b. Pap smear
    c. Urinalysis
    d. Blood draw

175. March 4, 2011, Copy of Prescription
    a. Susan Hildebrandt NP requesting an Independent Functional Capabilities evaluation to clarify current functional Abilities
    b. Mentions Fibromyalgia

176. March 10, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
   a.  Being treated well with Fibromyalgia medication, and feeling great.
   b.  She is doing great.
   c.  Being prescribed Savella made a "huge" difference in how she feels physically and mentally.
   d.  Guilt feelings related to disabled daughter
   e.  General feelings of guilt too.
177. March 18, 2011 Office Visit, Benewah, Susan Hildebrandt NP
   a.  Depression– improving. Good home status, refill of meds. Aggravated by conflict, stress, or lack of sleep. Improved and not feeling down.
   b.  Had symptoms of depression several days in the past 2 weeks.
   c.  Fatigue and loss of energy.
   d.  Fibromyalgia– dull when resting. Aggravated by movement.
   e.  Morbid Obesity. 224 lbs,
   f.  Sinusitis
   g.  Continuing counseling
178. April 6, 2011 Ergo Science Physical evaluation, hired by The Hartford, Evaluator = Clint Hubbard
   a.  Stated this was performed on 4/12/11 – but that is wrong
   b.  Duration was 4 hours and 9 minutes
   c.  High anxiety during test
   d.  Displayed pain behaviors that correlated with her self-reported pain
   e.  Under summary of medical history, it was stated that none of the treatment had provided her with long lasting relief
   f.  Major Areas of Dysfunction = Functional Endurance (CFS), Position Tolerance, Dynamic Strength.
   g.  Factors underlying performance = Generalized fatigue.
   h.  Had to use the restroom 4 to 5 times
   i.  Naturally occurring rest breaks throughout the exam to change equipment, 2-3 minutes at a time. Additionally, Mrs. May requested 4 other rest breaks due to fatigue.
   j.  Mrs. May's ability to sit and stand were recorded to be tolerable only occasionally (*only up to* 1/3 of the day)
   k.  Walking frequently
   l.  Fingering, handing, and feeling frequently to constantly
   m.  Reaching at or below the waist level frequently
   n.  Her finger dexterity was rated only between the 0-10 percentile.
   o.  "Very weak evidence of low effort and inconsistent behavior"
   p.  Her most severe areas of dysfunction were position tolerance, dynamic strength, and functional endurance.
   q.  Pain level was at a 7/10 by end of examination, and she was physically exhausted
   r.  For *all* physical tests performed, Mrs. May reported a pain of 6-8 (mostly 8s, only one 6).
      i.  This is including sitting for 1 minute without any self-limiting behavior.
      ii. The instructions: If pain "builds up too much, you may choose to stop even if you have not reached your maximum"….. "You will not be forced to do anything which you do not feel capable of doing."
   s.  Patricia incapable of sustaining light/sedentary work for an eight hour day, and would need to start back into a position with very limited hours and slowly increase.
   t.  Her overall level of work capability fell into the light range – However, ability to perform light level of work must take into account the history of anxiety and colon problems.
179. April 13, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW

   a. Decreased brain processing related to continual worry and stress and appeared to be overly stressed and concerned.
   b. Increased Depression
   c. Feeling stressed about things that are not within her control.
   d. Chronic medical issues that limit her daily activities.
180. April 15, 2011, IME completed by Dr. James
   a. Stated this was performed on 4/6/11 – but that is wrong.
   b. Stated this was performed by Dr. Jones – but that is wrong.
   c. Review of physical capabilities evaluation (April 6, 2011) indicated a maximum level of work could not be determined due to the claimant's self-limiting behavior.
   d. Patricia is incapable of working a full eight hour day for light or sedentary work.
   e. Patty reported multiple physical problems to Dr. James as well as depression, anxiety, feelings of worthlessness, nervous exhaustion and difficulty sleeping
   f. Cognitively intact, making financial transactions.
   g. Dr. James diagnosed generalized deconditioning and morbid obesity.
   h. Found no evidence for fibromyalgia, chronic fatigue, or disease of the colon that preclude her from working.
   i. Exam was normal.
   j. Exam was "normal," except tenderness in right knee and hip.
   k. Medical records show no documented diagnosis information confirming Fibromyalgia
   l. May has not seen a Rheumatologist
   m. No tender points to substantiate fibromyalgia. "No tender points on physical examination"
   n. No colon disease to prevent her from working.
   o. Even if she does have fibromyalgia, she would still be able to perform sedentary and light duty work
      i. She has muscle aches that would not prevent her from doing sedentary to light duty work on a full time basis.
   p. No evidence of Epstein-Barr virus in the record
   q. Restrictions and limitations are due solely to de-conditioning, not to a particular medical condition (generalized sedentary lifestyle, morbid obesity, deconditioning) No restrictions or limitations.
   r. May can sit up to 8 hours per day, stand for 1 hour at a time and up to 8 hours per day, walk for 1 hour at a time and up to 8 hours per day.
   s. Capable of constantly lifting/carrying up to 20 lbs; frequently up to 50 lbs, and occasionally up to 100lbs
   t. Capable of frequently climbing stairs, stooping, kneeling, crouching, and crawling
   u. Capable of reaching at all levels.
   v. Recommended full time sedentary work. No medical condition that prevents her from working, only self-limiting behaviors that keep her from working.
181. April 27, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
   a. Depression
   b. Has chronic medical issues that limit her daily activities
   c. "continued to have a GAF rating of 53"
182. May 25, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
   a. Mood improved, medication is helping.
   b. Much better, setting expectations, not feel bad.
   c. Mood and affect appeared to be bright and improved.
   d. Some emotions are automatic response to past experiences and trauma (related to father)
   e. Mrs. May feels like she is *just starting* to see some changes.

        f.    Has chronic medical issues that limit her daily activities.
        g.    GAF of 70, mild level of overall impairment.
        h.    Seen bi-weekly in therapy.
        i.    Making small changes in her life, and had been able to gain rewards and see the benefit of the changes.

183. May 25, 2011, Chrystal Hodgson Treatment plan review notes
              i.   GAF is 70 (mild)
              ii.   Improve mood and affect
        b.    Has chronic medical issues that limit her daily activities.
        c.    Continue working on improving her depression.
        d.    Continually addressing depressive symptoms.

184. June 8, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
        a.    Chronic Problems: Fibromyalgia, IBS, Obesity, Depression.
        b.    Comments: Going through a cycle of anger, sad, guilty, and expectation.
              i.   She was doing good, and now she is *not* and emotional.
              ii.   Mood and affect was depressed and tearful.
        c.    Making lasting changes in her life.
        d.    Chronic medical issues that limit her daily activities.
        e.    Client returning for treatment weekly.

185. June 23, 2011, Attending Physician's Statement, Susan Hildebrandt, NP
        a.    Diagnosis: Fibromyalgia, insomnia, obesity, depression.
        b.    Relationship problems
        c.    Gastroesophageal reflux disease, being treated.
        d.    Sinusitis.
        e.    Tick bite, being treated.

186. June 23, 2011, Chrystal Hodgson, Treatment Plan Review
        a.    This is taken from the Ohama report on Sept. 28, 2011.
              i.   Making good progress toward your symptoms.
              ii.   Reiterate that GAF on May 25, 2011 was 70.
        b.    Chronic Medical issues that limit her daily activities.
        c.    Depression
        d.    Continues to struggle and get stuck.
        e.    Mrs. May was *not present* at this meeting.
        f.    Making good progress towards her symptoms,

187. June 23, 2011 Office Visit, Susan Hildebrandt NP, Benewah
        a.    Depression
        b.    Fatigue, loss of energy, restlessness, sluggishness.
        c.    Insomnia
        d.    Daily Epigastric pain (abdomen)
        e.    Insomnia – changes to sleep pattern, chronic history
        f.    Diarrhea
        g.    Experiencing fatigue and loss of energy, but no thoughts of death or anxiety.

188. July 28, 2011, Chrystal Hodgson Individual Therapy notes
        a.    Mrs. May continues to struggle with depression.
        b.    Increase in irritability.
        c.    Has chronic medical issues that limit her daily activities.
        d.    Mood and affect appeared within normal limits.
        e.    She was worrying about other people that were out of her control.

    f.   She was given a GAF rating of 70 → This was tested on 5/25/11 (old)
189. July 29, 2011 Employability Analysis Report, Vocational Rehabilitation Clinical Case Manager Report
    a.   Jobs that Mrs. May is *supposedly* qualified for:
        i.    1. Cashier II
        ii.   2. Marker
        iii.  3. Cutter-and-Paster
        iv.   4. Garment Sorter
        v.    5. Cleaning, Housekeeping
        vi.   6. Ticket Taker
190. August 2, 2011, Denial of Insurance Letter, United of Omaha Life Insurance Company.
    a.   Coverage under the Continuation of Group Life Insurance during total disability is being
         terminated.
    b.   *See,* Admin Binder/Timeline
191. August 18, 2011, Denial of Letter of LTD, The Hartford.
    a.   See attached document for explanation of contents.
    b.   *See* Admin Binder/Timeline
192. August 30, 2011, Preventative Medicine, Susan Hildebrandt NP, Benewah Medical Center
    a.   Anxiety, tearful.
    b.   Bladder problems, irregular cycles, cramping.
    c.   Fatigue, night sweats, vertigo, Diarrhea – history of spastic colon, Edema at the ankles (build-up
         of fluid), frequent urination, urinary incontinence, weight gain, depression, nervous, headache,
         rash on abdomen and groin, Myalgias (muscle pain), moderate distress.
    d.   Agitation, anxiety, tearfulness
    e.   Recent report regarding her disability and was being questioned about whether she would continue
         with disability payments.
    f.   Good family support.
193. September 6, 2011, Letter from Benewah to Patty
    a.   Pap test was normal.
194. September 8, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
    a.   Depression mood swing much worse, new stressor from getting denied LTD.
    b.   Change in mood/affect
    c.   Mrs. May is "horrible".
    d.   Disability was cut off.
    e.   Stressed, anxious, and depressed
    f.   Difficulty sleeping, increased anxiety, overwhelmed feeling.
    g.   Mrs. May was not able to make it to last appointment because her depression was so severe.
    h.   Before this incident, Mrs. May has had trouble attending regular sessions because of depression.
    i.   GAF = 55, moderate level of impairment
    j.   Has chronic medical issues that limit her daily activities.
195. September 23, 2011, Individual Therapy, Benewah Medical Center, Chrystal Hodgson LMSW
    a.   Increased depression,
    b.   Making minimal progress
    c.   Great emotional and physical suffering.
    d.   Tearful,
    e.   Made moderate progress, but when anything stressful came up she internalized an "fell apart"
    f.   States her disability was cut off after the Hartford had requested the Benewah Medical Center to
         send information, and Benewah didn't do it.
    g.   Struggles with depression on a daily basis.
196. September 23, 2011, Treatment Plan Review, Benewah Medical Center, Chrystal Hodgson LMSW

a. Making only moderate progress.
b. Continues to struggle with depression on a daily basis
c. Anything stressful in her life, and she "falls apart"
197. September 28, 2011, Upheld decision to Deny Insurance, United of Omaha Life Insurance Company
    a. *See,* Admin Binder/Timeline
198. September 29, 2011 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a. Increase in anger feelings, anxiety, and depression.
    b. Physical symptoms increasing.
199. October 13, 2011 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a. Not sleeping well "at all"
    b. 10 lbs weight loss
200. November 18, 2011 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a. Lost over 30 lbs.
    b. Still unable to exercise due to her other problems
    c. Trouble sleeping
    d. High stress level
    e. In this report, Nick DeFilippis notes this was the last session that Ms. Hodgson had with Patricia
201. December 8, 2011 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a. Mrs. May is a "mess"
    b. Stress level very high and interfering with progress and increasing symptoms.
    c. "terrible" sleep
    d. Her reported mood is a 7 or 8 on a scale of 10 being the worst.
    e. Daily diarrhea interfering with daily activities
    f. Knee pain
    g. Very anxious and depressed
202. December 8, 2011 Medical Report, NP, Susan Hildebrandt, Benewah
    a. Depression – financial worries triggered it this time. Anxious and fearful thoughts.
    b. Irritable mood.
    c. Insomnia
    d. Fibromyalgia – worsening, decreased mobility, difficulty going to sleep, instability, limping, night pain, tenderness and weakness.
203. December 14, 2011, Multidisciplinary Panel Discussion, between Dr. Chagnon and Nick DeFilippis, PhD
    a. Dr. Chagnon's opinion:
        i. History of IBS, Depression, Fatigue and Fibromyalgia.
        ii. As of 8/18/11, capable of doing sedentary to light duty activities
        iii. Nothing in the medical record that would prevent her from working full time at sedentary to light duty.
        iv. Acknowledges pain, suggests she should work through the pain.
    b. Nick DeFilippis' opinion:
        i. From talking with Chrystal Hodgson, depression does not impair her function
        ii. Depression secondary to medical issues
        iii. Easy distractibility, trouble staying on task.
        iv. If medical situation improved, her depression would get better.
        v. Depression worsened when disability terminated.
        vi. No objective evidence to support cognitive impairment. Nothing to support her not working
        vii. She should be able to work under normal everyday stresses.
        viii. No reliability testing of medical record.

204. December 16, 2011, Peer-to-Peer phone call between Dr. Chagnon and Susan Hildebrandt, NP
   a. Record of the call is in Dr. Chagnon report, dated December 21, 2011.
   b. Dr. Chagnon *did* get a hold of Susan
   c. Susan had only seen Patricia *once* this year!!!
   d. She stated Patricia's disability is bowel related.
   e. She has fibromyalgia, but Susan not treating her for that.
   f. Issues related to bowel problems: Needs to be near a bathroom, has difficult going to the gym because of embarrassment, increased stress makes it flare up.
205. December 20, 2011 Individual Therapy, Chrystal Hodgson LMSW, Benewah
   a. Struggling with medical and weight issues
   b. Progress is minimal
   c. Unable to cope with life stressors
206. December 20, 2011 Treatment Review, Chrystal Hodgson LMSW, Benewah
   a. Chronic medical issues that limit her daily activities
   b. Depression
   c. Life stressors impact Mrs. May significantly.
   d. Lacks coping skills
207. December 21, 2011, MLS Group of Companies, Inc., Peer Review, Nick Defilippis, Ph.D (psychology) & Raymond Chagnon, MD (internal medicine)
   a. Nick DeFilippis, Ph.D
      i. Reasoning: *See,* all documents associated with dates used in his report
      ii. Conclusions:
         1. Psychiatric restrictions and limitations:
            a. Long-term issues with Depressive symptoms
            b. Depression not causing daily functioning impairments
            c. Patricia experiencing stress related to *chronic medical conditions*
            d. Emotional functioning improved by June 2011.
            e. Emotional flare up when Patricia found out her disability was being cut off
            f. "Thus, it seems the claimant was primarily stressed by the issues she was having in obtaining disability payments." Cannot find any limitations due to psychiatric issues. Only not being able to function in high stress
            g. Medical problems are causing physical limitations
         2. Capacity of work activities considering psychiatric situation:
            a. Long-term depression and anxiety.
            b. Depression and anxiety *wax and wane* somewhat
            c. No *objective impairment* of functional impairment because of depression and anxiety other than *self-report*!
            d. Questioning reliability of self-report because Patricia stated her psychiatric symptoms worsened after his disability was terminated. Nick DeFilippis could not objectively substantiate the impairment that the anxiety and depression caused Patricia.
            e. Basically, no job with extreme stress, but everyday stressors is fine.
   b. Raymond Chagnon, MD
      i. Peer-to-Peer discussion with Susan Hildebrandt. Had a very hard time getting a hold of Susan. There were a total of six different attempts to get a hold of Susan (both Dr.

Chagnon calling and Susan's office calling back) until Dr. Chagnon finally reached Susan Hildebrandt. *See,* phone call dated December 16, 2011.

ii. Conclusions:

1. From 8/18/11, what are the physical limitations or impairments?

   a. Since that date she has seen Susan Hildebrandt for depression, IBS, muscle pain and fibromyalgia, morbid obesity, fatigue and rosacea.

   b. She had a physical work performance evaluation done (which one?) – no specific restrictions or limitations were found.

      i. If he is referring to the physical exam by Ergo on April 6, 2011, it *specifically* states that she is *incapable* of working a sedentary or light position for 8 hours a day.

      ii. "Ability to return to a light level of work must take into account the history of anxiety and colon problems"- pg. 1 of Ergo report.

   c. On HEENT exam (what is that?) all tests were normal, although she did complain of vertigo.

   d. Does have anxiety.

   e. Agitated, anxious and tearful – but alludes that is only caused because she is "upset" that her disability was terminated.

   f. Currently remains upset, and is seeing Chyrstal Hodgson.

   g. Physical assessment:

      i. Lift and carry 20 lbs occas. (Ergo report says exert 20 lbs of force occas – her pain score 7 at 16 lbs, carry. Her pain score was 6 at 16 lbs, lift). Lift and carry 10 lbs freq. (Ergo says 10lbs of force freq.) Life and carry 5lbs const. (Ergo says negligible amount for force constantly – existing 2/3 of the time).

      ii. Push and pull 30lbs occas. (Ergo says her pain score 8 at 32 lbs, pushing. Her pain score was 8 at 30 lbs, pulling) Push and pull 20 lbs frequently. Push and pull 10 lbs const.

      iii. For *all* physical tests performed, Mrs. May reported a pain of 6-8 (mostly 8s, only one 6).

         1. This is including sitting for 1 minute without any self-limiting behavior.

      iv. Mrs. May's ability to sit and stand were recorded to be tolerable only occasionally (*only up to* 1/3 of the day)

      v. Her finger dexterity was rated only between the 0-10 percentile.

      vi. Her most severe areas of dysfunction were position tolerance and functional endurance.

      vii. Pain level was at a 7/10 by end of examination, and she was physically exhausted

2. Considering overall situation, what is your opinion for capacity to work?

   a. She does have pain but she can work through it.

   b. It is her decision to work through the pain or not.

   c. Nothing in medical record preventing her from working through pain, at full-time capacity within the restrictions discussed in question 1.

      d.   Working will be good for her fibromyalgia because she should be as active as possible.

208. January 2, 2012 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a.   No show for appointment

209. January 9, 2012, Letter from the Hartford Appeals office to Patty, explaining denial of benefits.
    a.   *See* Admin Binder/Timeline

210. March 6, 2012 Individual Therapy, Chrystal Hodgson LMSW, Benewah
    a.   Anxiety
    b.   Stress
    c.   Trying to cope with stress and the impact it has on Mrs. May in all areas of her life.
    d.   Chrystal Hodgson is transferring Mrs. May as a patient to Brigette Hager.

211. March 6, 2012 Transfer Summary, Chrystal Hodgson LMSW, Benewah
    a.   Attendance to appointments is sporadic due to medical conditions
    b.   Depression
    c.   Struggles with increase in stress and ability to cope.

212. March 29, 2012 Individual Therapy, Brigette Hager, Benewah
    a.   Initial meeting with Bridgette as her new provider
    b.   Mood is "blue"
    c.   Grief and loss of health
    d.   Physical illness and limitations
    e.   Irritable, depressed

213. April 5, 2012 Telephone message, Brigette Hager, Benewah
    a.   Last minute cancellation due to gastrointestinal issues.

214. April 26, 2012 Individual Therapy, Brigette Hager, Benewah
    a.   Pain and suffering discussed as possibly linked to her obsessive eating behavior
    b.   Wakes up anxious
    c.   Depressed mood

215. June 1, 2012 Individual Therapy, Brigette Hager, Benewah
    a.   Chronic pain
    b.   Increased Depression
    c.   Chronic fatigue
    d.   Stressors and grief related to her loss of health at a young and vibrant age and the impact this has had on her life and future.

216. June 7, 2012 Medical Report, Office visit, Benewah
    a.   Depression, everyday symptoms
    b.   Fibromyalgia – mild/moderate severity
    c.   Insomnia
    d.   Severe back pain, at level 8
    e.   IBS suspected, full stool work up ordered.
    f.   Weight = 227lbs

217. June 15, 2012 Individual Therapy, Brigette Hager, Benewah
    a.   Anxiety
    b.   Fair progress as evidence by following through with advocating for her medical needs.
    c.   Only some relief with anxiety and depression symptoms with coping thoughts.

218. June 21, 2012 Medical Report, Dr. Raymond Paz, Benewah
    a.   Persistent and Severe back pain.
    b.   Pain in thighs and hips
    c.   Tenderness, stiffness and weakness

      d.   Weight gain
      e.   Restless legs syndrome
      f.   Spine is positive for posterior tenderness

219. June 21, 2012, The Hartford – Benefit Management Services Report

    a.   Pg. 3
          i.   Hartford acknowledges that "Patricia May has multiple medical conditions that may require ongoing treatment, the presence of a medical condition, reported symptoms or the treatment thereof does not determine a disability
         ii.   The Hartford considers Patty's continuing receipt of SSDI benefits as one piece of relevant evidence.
        iii.   Hartford relied on the combined findings of IME, FCE, and co-morbid Independent Medical Consultant reviews to support Patty's ability to perform sedentary level work activities.

    b.   Pg.5
          i.   This is a policy governed by ERISA and situated in Washington.

    c.   pg. 6
          i.   Suggested occupation: The *only* occupation remaining of those initially identified is Cutter and Paster, Press Clippings under the heading of Office Clerks General.
              1.   This job would entail: answering phones, bookkeeping, typing or word processing, stenography, office machine operation and filing.
              2.   Sedentary.

    d.   Pg. 8
          i.   Based on his conversation with Ms. Hildebrandt and a review of all submitted medical information, Dr. Chagnon makes his opinion
         ii.   Dr. DeFilippis spoke with Ms. Hodgson who stated that Patty's depression doesn't affect her daily function. However, notes that Patty cancels often because of her medical problems.

    e.   Pg. 9
          i.   Dr. DeFillippis states that the records indicate that Mrs. May *does* have some problems related to anxiety and depression; however, *he states* that he cannot objectively substantiate in terms of their significance beyond being mild issues.
         ii.   Dr. DeFilippis states that Mrs. May should not have difficulty based on the information provided,  in coping with every day stressors.

    f.   Pg. 13
          i.   The Hartford's impression of Mrs. May's reaction when this whole case started to go downhill…..

    g.   Pg. 15
          i.   There were *supposed* to be *two* IMEs performed, but it was determined that Mrs. May did not have a disabling psychiatric condition – and it was found that a psychiatric IMS was not warranted.

    h.   Pg. 16.
          i.   The Puget Sound Energy, Inc. policy *defines* Total Disability as: After 24 months, you will continue to be considered totally disable d if you cannot work at any job for which your education, training *and* experience qualify you.

    i.   Pg. 17
          i.   The Hartford acknowledges that Mrs. May is claiming there are discrepancies in Dr. James' report, and asked Mrs. May to send them a written list of the reported inaccuracies.

  j. Pg. 18
    i. Mrs. May felt Dr. James was out to get her
    ii. Mrs. May expressed frustration over the IME physician Dr. James
    iii. Mrs. May stated that the Dr. was "a snot" and could tell that she worked for The Hartford.
    iv. Dr. only spent 45 minutes with her and didn't test her sore spots and mostly spke to her spouse.
    v. Mrs. May had attempted to get a Specialist by they don't take Medicare or cash.

220. July 6, 2012, Office Visit, Dr. Raymond Paz, Benewah
 a. Reporting bad back pain. Aching, then starts becoming sharp pains with tenderness and tingling.
 b. Pain is worse.
 c. Exercising causing pain
 d. IBS

221. July 12, 2012 Individual Therapy, Brigette Hager, Benewah
 a. Depression

222. August 10, 2012 Office visit, Dr. Raymond Paz, Benewah
 a. Back pain – has been doing exercises, pain level is 4-5 and worsens with standing and walking with hands forward.
 b. Anxiety, no change
 c. Fibromyalgia

223. August 23, 2012 Individual Therapy, Brigette Hager, Benewah
 a. Depression
 b. Good progress with slight increase in exercise and seeing a nutritionist.

224. September 7, 2012 Office visit, Dr. Raymond Paz, Benewah
 a. Lesions on legs removed.
 b. Back pain
 c. Muscle pain, Firbromyalgia
 d. Weight loss, 14 lbs since June 2012

225. November 1, 2012 Individual Therapy, Brigette Hager, Benewah
 a. Increase in depressive symptoms
 b. Exploring trauma trigger
 c. Fair progess towards her objectives

226. November 21, 2012 Office visit, Dr. Raymond Paz, Benewah
 a. Fibromyalgia, refill given. Acknowledges that patient feels increased pain when off medication for one week, had trouble walking
 b. Wakes up from panic attacks
 c. Inertmitent diarrhea and cramping. Stress affecting diarrhea.
 d. Back pain, bone and joint symptoms
 e. Chronic Problems stated: Depression, IBS, Muscle pain, Fibromyalgia, Morbid Obesity, Rosacea.

227. November 29, 2012 Individual Therapy, Brigette Hager, Benewah
 a. Depression
 b. Appears to be thinking more positively despite her struggle with medical and other symptoms

228. January 22, 2013, Individual Therapy, Brigette Hager, Benewah
 a. Depression, severe
 b. Depression, affect congruent
 c. "Ct is making good progress towards her objectives as evidenced by setting boundaries and using assertiveness skilled… an accepting her limitations."
 d. Self-perception is abasing (low self-esteem)

e. "Patricia has chronic medical issues that limit her daily activities."

229. February 5, 2013, Dr. Paz Office Visit notes
   a. Fibromyalgia
   b. She is having all over pain
   c. No change to past medical history
   d. Muscle pain

230. March 28, 2013, Individual Therapy notes, Brigette Hager, Benewah
   a. Depression
   b. Self-perception is abasing (low self-esteem)
   c. "Patricia has chronic medical issues that limit her daily activities."

231. April 1, 2013, Dr. Paz, Office Visit notes
   a. Rash
   b. Pain

232. April 15, 2013, Dr. Paz, Office Visit notes
   a. Rash
   b. Fatigue, chills, fever, night sweats, weight gain
   c. Chest pain
   d. Blood in stool, diarrhea, nausea, vomiting, change in stool pattern
   e. Pain score = 4/10

233. June 4, 2013, Treatment Plan Review, Brigette Hager
   a. Severe Depression
   b. Depressive symptoms continue to impair daily functioning
   c. "Ct is making fair progress towards her treatment objectives as evidenced by attending therapy sessions and engaging in medication treatment with her PCP for chronic fatigue syndrome and medical struggles that impair her daily functioning significantly."

234. June 19, 2013, Office notes, Brigette Hager
   a. Depression

235. July 2, 2013, Individual Therapy notes, Brigette Hager
   a. Depression
   b. Treatment necessary to maintain or improve current level of functioning
   c. "Ct is making fair progress towards her treatment objectives as evidenced by maintaining coping skills."
   d. Self-perception is abasing (low self-esteem)

236. July, 15, 2013, Dr. Paz, Office visit notes
   a. Right upper arm pain.
   b. Occurring occasionally and worsening
   c. The pain is piercing and pressure.
   d. Pain is aggravated by lifting and movement
   e. There are no relieving factors
   f. Associated symptoms include tingling in the arms and weakness.
   g. "Pt notice it mostly when she has a laptop and is placing on shelf. Pt has difficulty hold a gal. of milk out."
   h. Musculoskeletal tenderness
   i. Cervical spine- tender
   j. It is possible that her neck is the source for some of her pain as well.

237. September 9, 2013, Dr. Paz, Preventative Medicine Chart Note
   a. Insomnia and night sweats
   b. Associated symptoms include anxiety, depression and sleep disturbances.

Medical History Timeline, Patty May
Page 27

 

      c.  Irritable Bowel Syndrome: associated symptoms include anxiety, fatigue, and heartburn.
           i.  Still having diarrhea, on medication.
      d.  Nasal drainage, vision changes
      e.  Diarrhea
      f.  Back pain
      g.  Muscle cramps
      h.  Low mood
      i.  Fibromyalgia
           i.  "Very tender to touch on her back and the front of her chest. Extremely tired and achy feeling."
           ii.  "She definitely does still have active fibromyalgia with 18 out of 18 tender points."
      j.  Depression
238. September 26, 2013, Dr. Paz, Office Visit Chart Notes
      a.  Depression
           i.  Depressed mood and difficulty staying asleep.
           ii.  On medication, but hasn't noticed a change.
      b.  Foot pain
      c.  Elevated liver enzymes
239. October 24, 2013, Dr. Paz, Office Visit notes
      a.  Bone scan
      b.  Taking medications but does not help alleviate pain.
      c.  Depression
      d.  Patient has bilateral thoracic paraspinal tenderness and rhomboid tenderness to palpation. Bilateral paraspinal pain with palpation to the lumbar area.
      e.  "During our visit, as we talk about fecal urgency she becomes flushed and tearful."
      f.  Opeopenia
           i.  She has Opeopenia, discussed bone density testing results.
      g.  Back pain
      h.  Depression
      i.  Spine osteoarthritis.
      j.  She does have overlying fibromyalgia.
      k.  Diarrhea, acute/chronic
           i.  "Patient has a long-standing history of diarrhea. She reports that she's been to many gastroenterologists and still ends up having fecal urgency and toileting accidents. She is concerned about the possibility of being in water therapy and not being able to control her bowels."
           ii.  She has been using Imodium with limited benefit.

# Exhibit 5: Dr. Thomas O'Meara report, October 28, 1993

**IMPRESSION:**

1. Very complex case of idiopathic diarrhea, status post a relatively complete workup, on chronic Sandostatin, with no new symptomatology that sheds light on this problem.
2. Chronic fatigue syndrome, being seen at the Harborview Clinic
3. Recent weight gain of unclear etiology.
4. Chronic nausea.

**RECOMMENDATIONS:** At this point I feel a complete review of Pat's case is indicated. My tendency is to look at this as a possible case of GI hormone excess, and I will probably be in touch with Dr. Dee Orsini (?) at Ohio State, who is recognized as an expert on hormone–induced diarrhea. We certainly have demonstrated, I feel, relatively satisfactorily that she does not have inflammatory bowel disease, malabsorption, carbohydrate intolerance, or chronic infection. At this time, then, I will review her chart. I spent 45 minutes with the patient today. We will work with a plan from there.

**INTERVAL HISTORY:** Pat is back for interval follow–up. I did not have her chart today, but I do remember her case fairly well. She has had chronic diarrhea that then became bloody. Colonoscopy was compatible with a UC versus an infectious etiology, and, in fact, she grew out Salmonella. This gradually resolved, and she was back to her baseline of diarrhea. Today she reports that she is still on Sandostatin one to two times a day subcu. She will have four to five bowel movements at night and states that her symptoms are worse about two weeks before her period, namely, the time of her ovulation. She reports that she has nausea "a lot more." I do believe we assessed her as an irritable bowel syndrome, which can obviously involve colon, small bowel, and large bowel and can occasionally present as a chronic intestinal pseudo–obstruction syndrome. I do not believe that up until now she has fit that pattern. The patient states she is not under any stress, but her mother reports to me that she (her mom) was recently diagnosed as having multiple sclerosis based on a positive MRI. Her symptoms are manifested by occasional lower extremity weakness requiring walking with a cane at times.

As far as systemic symptoms, Pat has had a 10–pound weight gain. She had chronic fatigue and apparently is getting some help from the Harborview Clinic. Apparently, an amino acid solution has helped her energy level.

Past history will be reviewed in detail. She has had no major medical interventions, as far as I can tell, since I have last seen her.

---

NAME:    MAY, Patricia
OMC #
DATE:    October 28, 1993
page  1

**Olympia Multi–specialty Clinic**
**GASTROENTEROLOGY NOTE**

SOCIAL HISTORY:  I suspect her husband is probably cured now from his testicular carcinoma, and the patient states that she is under no stress.  She works out with her horses frequently and appears to be very healthy.  She certainly doesn't appear to be chronically ill.

Meds include but are not necessarily limited to Zoloft, 100 mg h.s., amino acid solution q.i.d., Sandostatin b.i.d.  She apparently is on B12, I'm not sure if those are shots or tablets.  Trazodone, 150 mg a day, Imodium p.r.n.  She states the Imodium does not really do much good.  One would think the Trazodone's anticholinergic effect would also tend to oppose her constipation.

PHYSICAL EXAMINATION:
Vitals:           Weight 141.  Blood pressure 136/74.
HEENT:          Sclerae clear.  No adenopathy or thyromegaly.
Chest:           Clear to auscultation and percussion.
Heart:           Regular rhythm without murmur, gallop or rub.
Abdomen:        No mass, organomegaly or focal tenderness.  No ascites, bruits, or
                 rubs.
Extremities:     No cyanosis, clubbing, or edema.  No unusual rashes noted.


                                          Thomas F. O'Meara, M.D., FACP, FACG
                                          Gastroenterology/Hepatology


TFO/as :EMT


NAME:      MAY, Patricia
OMC #
DATE:      October 28, 1993
page  2                                   Olympia Multi-specialty Clinic
                                          GASTROENTEROLOGY NOTE

# Exhibit 6: Dr. Andriacchi Laparoscopy Report, December 3, 1990

ST. PETER HOSPITAL
Olympia, Washington

DATE OF OPERATION:  12/03/90
SURGEON:  F. C. ANDRIACCHI, M.D.
COSURGEON:
ASSISTANT:
CIRCULATOR:  L. WALKER, R.N.                  SCRUB:  S. PRIDEAUX, O.R.T.
ANESTHESIOLOGIST:  T. E. FELL, M.D.              ANES.TYPE:  GENERAL
ANES.BEGAN:  1755      ANES.ENDED:  1900      OP.BEGAN:  1815      OP.ENDED:  1850

PREOPERATIVE DIAGNOSIS:      1)  CHRONIC RIGHT LOWER QUADRANT PAIN.  2)
                            POSSIBLY AN ENLARGED ENDOCERVICAL CANAL.
POSTOPERATIVE DIAGNOSIS:    SAME.
OPERATION:                  DIAGNOSTIC LAPAROSCOPY; DILATATION AND CURETTAGE.

FINDINGS:  The uterus was approximately six weeks in size and grossly normal in
appearance.  The fallopian tubes bilaterally appeared normal.  The ovaries
bilaterally measured 3 x 3 x 2 cm. and were essentially normal in appearance.
The left ovary had an approximately 1 x 1 cm. clear-colored cyst noted at its
inferior pole.  The tubes bilaterally appeared to be status post tubal
ligation.  The anterior and posterior cul-de-sacs were clean.  There was no
evidence of pelvic endometriosis.  There was no evidence of pelvic adhesive
disease.  The abdomen was inspected in its entirety.  The liver edge and
gallbladder appeared to be normal to palpation.  The appendix was able to be
seen.  It was somewhat retrocecal.  However, one could definitely see the
appendix.  There was no sign of inflammation.  There was no sign of any
abnormality in that region.  The appendix was not edematous or erythematous.
However, it was covered in a veil of adhesions, to the posterior abdominal
wall.  Also, fine filmy adhesions were noted running between the small bowel
and the anterior peritoneum, in that area.  Again, there was no sign of active
inflammation.  No other pathology was noted.

On endocervical curettage, essentially no tissue was returned.  What was
evident, however, was submitted for pathology report.  The uterus was sounded
to 9 cm.  At endometrial curettage, only minimal tissue was returned.  No
endometrial polyps were noted with the polyp forceps.

PROCEDURE:  With the patient in the modified low dorsolithotomy position and
after adequate general anesthesia was obtained, the abdomen, perineum and
vagina were prepped and draped in a manner customary for laparoscopy.  A single
toothed tenaculum was placed on the anterior lip of the cervix.  The acorn
cannula was inserted into the cervical os and secured with a single toothed
tenaculum.  Bilateral punctate incisions were made at the level of the
umbilicus.  The Veress needle was inserted through the right punctate incision
and into the abdominal cavity.  The abdominal cavity was filled with 3 liters
of carbon dioxide gas.  The Veress needle was removed.  The punctate incisions
were united in the midline with a 1.5 cm. paraumbilical skin incision.  Through
this incision, the primary trocar was inserted into the abdominal cavity.  The
trocar was removed and the laparoscope was inserted through its sheath.  A 1
cm. suprapubic skin incision was made.  Through this incision, a secondary
trocar was inserted into the abdominal cavity.  The trocar was removed, and the
wand was inserted through its sheath.  The pelvis was inspected with the above
stated findings noted.  There really was no sign of pelvic abnormality.

INP     Room No:   DISC-H       Age: 34Y                              30
Dic.Date:  12/03/90              F. C. ANDRIACCHI, M.D.               168 2
MR:  21-25-07                   PT:
PATIENT:  May, Patricia R.
!~()~[1;5&J![()                                       OPERATIVE REPORT

ST. PETER HOSPITAL
Olympia, Washington

PAGE 2

There were the fine filmy adhesions noted in the right lower quadrant. However, there was no sign of active inflammation. The appendix did not appear to be actively inflamed. There certainly was a small veil of adhesions overlying the appendix. I really felt that this could only be very remotely the cause of her chronic pelvic pain and, thus, did not pursue an elective appendectomy. I certainly will discuss the findings with her should she desire to pursue this in the future, but this certainly would have been an elective, perhaps evens non-indicated appendectomy if it were to be pursued currently. In any event, no other pathology was noted. There was approximately 50 cc's of blood noted in the posterior cul-de-sac. This was most likely secondary to the activity of the laparoscopic procedure itself. I did aspirate this and then irrigated the area. I did not see any sign of active bleeding at any of the trocar sites.

At this point, the surgeon returned to the perineum. The acorn cannula was removed from the cervical os. Endocervical curettage was pursued. The uterus was sounded to approximately 9 cm. The endocervical canal was progressively and very easily dilated. Endometrial curettage to a definite uterine cry on all surfaces was performed. No endometrial polyps were noted with the polyp forceps. The acorn cannula was then reinserted into the cervical os and secured with a single-toothed tenaculum.

The surgeon then changed to a sterile pair of gloves and returned to the abdomen. The abdomen was again inspected to be sure there is no site of perforation secondary to the D&C and all appeared to be normal. There was no sign of active bleeding and no further blood was in the pelvis. The wand and its instrument were removed from the abdominal cavity under direct visualization. The laparoscope was removed from its sheath. The abdomen was emptied of excess carbon dioxide gas. The site of entrance of the secondary trocar was visualized and there was no sign of bleeding. The laparoscope and the sheath were then removed from the abdominal cavity under direct visualization. The paraumbilical skin incision was closed using three interrupted sutures of #3-0 plain. The suprapubic skin incision was closed using two interrupted sutures of #3-0 plain. Steri-Strips were placed over the incisional sites. The acorn cannula and the single-toothed tenaculum were removed from the cervix. Final needle, instrument and sponge counts were correct. Estimated blood loss was approximately 50-75 cc's. There were no complications. The patient tolerated the procedure well, and she was transferred to the Recovery Room in stable condition.

F. C. ANDRIACCHI, M.D.

FCA/CLC

D: 12/03/90 18:57                     T: 12/07/90 20:06,1725
CC: ANGELA CHAN, M.D.

INP   Room No: DISC-H       Age: 34Y
Adm.Date: 12/03/90          F. C. ANDRIACCHI, M.D.
MR: 21-25-07                PT:
PATIENT: May, Patricia R.
!^()^[1;5&J![()

OPERATIVE REPORT

# Exhibit 7: Telephone conversation between Dr. O'Meara and Dr. Andriacchi, December 4, 1990

MAY, PAT                              12/04/90
Telephone Conversation


I talked with Dr. Andriacchi today. Pat had a negative
laparoscopy other than for some small adhesions around the
appendix. No evidence of appendicitis or any primary GI or GYN
problem. There was a large amount of narcotics taken in the
recovery room and the patient was even kept overnight because of
this. We considered the possibility of an elective surgery for
recurrent right-sided pain, but I think both of us are hesitant
at this time to pursue that course.


                              THOMAS F. O'MEARA, M.D.
                              OMC, Gastroenterology

TFO/mb/OTS

# Exhibit 8: Dr. Norton Operative Report, December 26, 1990



## OPERATIVE REPORT

**DATE OF OPERATION:** 12/26/90         **PT. TYPE:** IN

<u>PREOPERATIVE DIAGNOSIS</u>: RIGHT LOWER QUADRANT ABDOMINAL PAIN.

<u>POSTOPERATIVE DIAGNOSIS</u>: MULTIPLE ADHESIONS IN THE RIGHT LOWER QUADRANT.

OPERATION: EXPLORATION OF RIGHT LOWER QUADRANT. APPENDECTOMY. ADHESIOLYSIS.

SURGEON: R. STEVEN NORTON, M.D.

ASSISTANT:

ANESTHESIOLOGIST: W. Collins, M.D.     ANESTHESIA: GEN/ET

Anesthesia Start Time: 1300     Anesthesia Stop Time: 1430

Operative Start Time: 1320     Operative Stop Time: 1415

OPERATIVE FINDINGS: The patient had multiple adhesions of the right lower quadrant to the anterior abdominal wall. The appendix appeared normal. There was no evidence for any Meckel's diverticula along the distal small bowel.

PROCEDURE: After adequate general anesthesia, the patient's abdomen was prepped and draped in the usual fashion. A right lower quadrant incision was made and after splitting the muscles along the direction of their fibers, the peritoneum was then entered. The adhesions to the anterior abdominal wall were then taken down sharply, the cecum was elevated, the appendix was noted to be normal. After clamping the mesoappendix and ligating it with 3-0 Chromic, the base of the appendix was crushed. The base of the appendix was then ligated using 0 Chromic and the distal appendix was amputated. The appendiceal stump was then fulgurated. The distal 2-3 feet of small bowel was then exteriorized and there was no evidence for any Meckel's. After placing the viscera back into the abdominal cavity, the right lower quadrant was then thoroughly irrigated. After achieving adequate hemostasis, the wound was closed using 2-0 PDS on the fascial layers. The subcutaneous tissue was reapproximated using 2-0 Vicryl and the skin was closed using a running 3-0 subcuticular Vicryl.

Continued...

CAPITAL MEDICAL CENTER
Olympia  WA

Patient Name:    MAY, PATRICIA
Medical Record #:



Operative Report (cont.)

The patient was awakened, she was extubated and taken to the recovery room in stable condition.

R. STEVEN NORTON, M.D.

DD: 4/23/91
TD: 04/24/91
TT: 1928
TR: rad

Page 2

CAPITAL MEDICAL CENTER
Olympia WA

Patient Name:      MAY, PATRICIA
Medical Record #:

**OPERATIVE REPORT**

May2427